2012 ME 130

**STATE of Maine**

v.

**Linda DOLLOFF.**

Supreme Judicial Court of Maine.

Argued: April 11, 2012.

Decided: Nov. 27, 2012.

1034

Verne E. Paradie, Jr., Esq. (orally), Trafton & Matzen, LLP, Auburn, for appellant Linda Dolloff.

Stephanie Anderson, District Attorney, and Anne Berlind (orally), Asst. Dist. Arty., Prosecutorial District No. Two, Portland, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SAUFLEY, C.J.

[¶ 1] Jeffrey Dolloff was bludgeoned, nearly to death, in his own bed during the early hours of April 12, 2009. The weapon used to inflict the injuries was determined to be his own softball bat. Linda Dolloff, Jeffrey's estranged wife who was still living in their home, became the focus of the

investigation into the assault. Following a jury trial, Linda was found guilty of attempted murder along with two related crimes. Linda now appeals from those judgments of conviction, entered by the trial court (*Wheeler, J.*) upon the jury's verdict finding her guilty of attempted murder (Class A), 17–A M.R.S. § 152(1)(A) (2011); *see* 17–A M.R.S. § 201 (2011), elevated aggravated assault (Class A), 17–A M.R.S. § 208–B(1)(A), (2) (2011), and false public alarm or report (Class D), 17–A M.R.S. § 509(1)(A), (2) (2011). We affirm the judgment.

[¶ 2] Linda asserts that the trial court made several evidentiary errors and that improper statements made by the prosecutor during the trial constituted prosecutorial misconduct that deprived her of a fair trial. We conclude that no evidentiary errors occurred and focus much of our discussion on Linda's assertions of prosecutorial misconduct.[1]

## I. BACKGROUND

[¶ 3] The following facts, viewed in the light most favorable to the State, rationally support the verdict. *See State v. Haag*, 2012 ME 94, ¶¶ 2, 17, 48 A.3d 207.

[¶ 4] Jeffrey and Linda Dolloff were married in 1998 and resided together in a home in Standish on Dolloff Road near the homes of other members of Jeffrey's family. They had both put extensive time and effort into building their home. Jeffrey had three daughters from a prior marriage. He often spent four to five nights a week away from home working as a consultant. Jeffrey owned approximately twenty-four guns that he kept in the home. He taught his daughters and Linda how to handle firearms. Linda taught yoga classes and was writing a murder-mystery

novel. The marriage was a rocky one, and the couple had discussed divorcing on multiple occasions. At the time of the assault, they were maintaining separate bedrooms.

[¶ 5] Approximately two weeks before the April 12, 2009, incident, Jeffrey and Linda reached an agreement to separate. The agreement provided that Jeffrey would pay Linda a lump sum of money, that Linda would live in an apartment attached to their home for one year, that during this year Jeffrey would pay Linda's bills and expenses incurred from "groceries [and] vehicles," and that Linda would receive half of the ownership rights to the two properties that they jointly owned. Jeffrey believed that Linda agreed to the separation because she hoped that, after a few months apart, they would eventually reconcile. Nonetheless, Jeffrey told Linda he intended to bring a girlfriend home to meet his family during an upcoming weekend.

[¶ 6] In the early morning hours of April 12, 2009, at approximately 3:00 a.m., Linda placed a call to 911 to report that there was an intruder in her home, that she had been shot, and that her husband had been seriously injured. Officers were immediately dispatched to the scene.

[¶ 7] The first two officers to arrive approached the home with their weapons drawn. One of the officers reported to dispatch that he saw a person move in a window on the first floor. Linda's call was still connected to 911 when the officers arrived, although there were minutes when it sounded as if she had set the phone down and walked away from it. The officers instructed dispatch to tell Linda to turn on the lights and to come out the front door. At some point, Linda returned to her phone, and shortly thereafter, she

---

1. To the extent that Linda raises additional arguments, and asserts other instances of prosecutorial misconduct not discussed here, we are unpersuaded.

stumbled out of the house, falling face-first onto the porch. Jeffrey and Linda's dog, Zoe, ran out the front door as Linda exited. Linda was visibly upset and crying, and she was bleeding from a gunshot wound above her right hip.

[¶ 8] The officers proceeded into the home and found empty bullet casings on the steps leading up to the second floor, a gun at the top of the stairs, and Jeffrey lying on the bed in his room, covered in blood. A softball bat, the weapon used to inflict Jeffrey's injuries, was found near his bed. It was covered in blood and had been partially burned.

[¶ 9] While emergency personnel attended to Jeffrey, officers searched the home and did not find anyone else present. Officers then used a dog to search within the perimeter of the property, which included multiple structures. The dog picked up two scent tracks. The first track ran between the garage door and the Dolloffs' vehicles parked on the driveway. The second, older scent track ran across a field that led to a residence owned by Jeffrey's brother. Officers also found that the home's kitchen drawers had been pulled open, and the glove compartments of the Dolloffs' vehicles had been opened. An envelope containing $1,500 in cash, which had been in a drawer in Jeffrey's bedroom, was left on the floor of the bedroom. The gun used to shoot Linda had been taken from the same drawer. Officers discovered Jeffrey's wallet, with a substantial amount of cash in it, on the bedroom floor at the foot of the bed near the bureau. Jeffrey's adult daughter and her boyfriend, who lived in an apartment attached to the Dolloffs' home, did not hear anything until police arrived and knocked on their window.

[¶ 10] Jeffrey and Linda were both transported to Maine Medical Center. Jeffrey sustained life-threatening injuries that included multiple skull fractures and a fractured nose. Many of his teeth had been knocked out. Later, it was determined that Jeffrey's injuries were caused by blunt force trauma from at least three blows to his head while he was lying on his pillow. Jeffrey spent over a week at Maine Medical Center, three weeks at a clinic in Massachusetts, and additional time at a rehabilitation hospital in Portland. He will never fully recover from his injuries and has no memory of the events that occurred on the night of the assault.

[¶ 11] Linda's injuries were not life-threatening. She sustained a bullet wound to an area above her hip bone that did not affect any vital organs. Jeffrey's blood was found on her clothing and the soles of her feet. Investigators discovered Linda's DNA, along with other unidentified DNA, on a swab taken from the bat that was used to assault Jeffrey.[2] Linda's DNA was not found on a swab taken from the trigger of the gun that was used to fire the shot into her abdomen, although it was found on swabs taken elsewhere on the gun. Investigators also discovered DNA from a male on the swab taken from the trigger, but the amount recovered proved insufficient to compare with known individual DNA samples.

[¶ 12] The parties stipulated to a statement given by Detective Scott Gosselin of the Maine State Police, which the court read into evidence. The stipulation contained conclusions about the nature of the assault, which were based on an analysis of blood stains at the scene, the weapons involved, the medical examiner's report,

---

**2.** Evidence presented at trial contradicts Linda's contention that her DNA was not found on the bat.

forensic chemistry and DNA reports, and Linda's statements to police. The stipulation also included an agreement that the blood spatter and DNA evidence was inconclusive regarding Linda's role in the assault.

## II. PROCEDURE

[¶ 13] On July 10, 2009, Linda was indicted for the attempted murder of Jeffrey Dolloff, along with charges of elevated aggravated assault and false public alarm or report. Linda pleaded not guilty to all of the charges. Over the course of fifteen days, she was tried before a jury. She was represented by counsel throughout the proceedings.

[¶ 14] The State's theory at trial was that Linda intended to murder Jeffrey in order to keep all of the property and the lifestyle that she had grown accustomed to. The prosecutor told the jury that the evidence would support that theory and would show that Linda intended to kill Jeffrey with the bat and that she shot herself to make the assault look like a home invasion. Linda asserted that she and Jeffrey were both victims of a home invasion.

[¶ 15] Before trial, the court denied the State's motion in limine seeking to offer certain evidence regarding Linda's prior cosmetic surgeries. The court also addressed the State's motion in limine seeking to offer, among other things, specific evidence of Linda's prior strained relationship with Jeffrey's daughters. Linda objected. During a chambers conference, the court ruled that the particular instances cited in the State's motion would not be allowed in evidence because most of the information was "too old and too prejudicial to be probative as ... character evidence." However, the court noted that what happened during the week before the 2009 incident was more relevant than what

may have happened earlier in Jeffrey and Linda's relationship, leaving further rulings for trial.

[¶ 16] During the trial, both sides presented witnesses and exhibits, including a tape recording of the 911 call. The jury was taken to the Dolloffs' home in Standish to view the scene of the assault. The State presented the testimony of the officers who responded to Linda's 911 call, other officers who were at the scene, a dispatcher, police investigators, crime lab technicians, Jeffrey Dolloff, and members of Jeffrey's family, among others. Linda presented the testimony of a private investigator and the State Medical Examiner.

[¶ 17] When asked about the softball bat found in his room after the attack, Jeffrey testified that he had owned the bat since 1975. Additionally, he testified that hundreds of people had used the bat since that time. The prosecutor asked Jeffrey, "Have any women used this bat?" Jeffrey responded, "Over the years, yes. It's usually a little too heavy for them but they try." The prosecutor, a woman, then said, "I don't think it's too heavy." Linda did not object at the time of the prosecutor's statement.

[¶ 18] Jeffrey also testified that, when he and Linda finally moved into the house that they built together, they did not share a bedroom. When asked why, he responded, "It was a divorce pending and we just—it wasn't working." When asked what he meant by "divorce pending," Jeffrey replied that Linda "couldn't get along" with his daughters and "had a history of not getting along" with them. Linda objected to Jeffrey's testimony, citing the court's earlier ruling on the State's motion in limine. The court allowed Jeffrey's testimony, ruling that it was not offered for the truth of the matter asserted, but rather to show Jeffrey's state of

mind. Later, Linda renewed her objection, stating that the testimony was more prejudicial than probative and that the State purposely elicited the testimony. The court declined to take any further action regarding the brief testimony about Linda's relationship with Jeffrey's daughters.

[¶ 19] One of the State's expert witnesses, a forensic scientist employed at the Maine State Police Crime Lab, testified to her opinion regarding how certain bloody footprints found at the crime scene were produced. During her testimony, photos that she had taken at the scene, which she had used to write her report, were admitted in evidence. Linda objected to the expert's testimony, arguing that nowhere in her expert report did she explicitly give her opinion as to how any particular footprint was made. The court overruled the objection. At the end of the expert's testimony, Linda again objected to the expert's conclusions regarding the footprints because the content of her testimony was not entirely included in her expert report. Linda requested that the testimony be excluded in its entirety. The court denied the request, concluding that there had been no violation of the expert-reporting rule.

[¶ 20] The State also introduced in evidence a computer file entitled "Corinthians" that was retrieved from Linda's computer by the Maine State Police Computer Crimes Unit. Linda objected to the admission of the evidence because the file was a compilation of documents that were written over an unspecified period of time, the witness could testify only that the documents were taken from a computer found in Linda's room with a user name of "Linda," and the information was cumulative. The court overruled the objection and admitted a redacted version of the file.

[¶ 21] In addition to admitting the writings in evidence, the court allowed the officer who retrieved the documents from Linda's computer to read them aloud to the jury and for the documents to be projected onto a screen during his testimony.[3] At the end of the officer's direct testimony, Linda once again objected to the evidence and moved for a mistrial. The court overruled the objection and denied her motion.

[¶ 22] During the State's closing argument and rebuttal, the prosecutor used terms and phrases, or made statements, that Linda alleges constituted prosecutorial misconduct. In response to the objections, the court gave corrective instructions reminding the jurors that it was their recollection of the facts that mattered, and not anything that the attorneys said in closing. At the end of the State's closing argument, Linda moved for a mistrial based on the comments made by the prosecutor. The court took the motion under advisement. During her rebuttal argument, the prosecutor again used the words "I think," and the court, sua sponte, told the prosecutor not to express her "personal opinion." At the close of the trial, the court instructed the jury that nothing said by the attorneys during opening or closing should be considered to be evidence.

[¶ 23] After deliberating for approximately nine hours, the jury returned a verdict finding Linda guilty of all three charges: attempted murder, elevated aggravated assault, and false public alarm or report. On January 10, 2011, the court

3. The writings related to the Dolloffs' agreement to separate, Linda's desire and attempts to save the marriage, and her thoughts and emotions concerning the couple's deteriorating relationship. The court allowed the witness to read the documents during his testimony, reasoning that publishing the writings to the jury "would take a while because each juror would then have to read it."

sentenced Linda to twenty-five years in prison with all but sixteen years suspended and four years of probation for each of the convictions for attempted murder and elevated aggravated assault; the sentences were to run concurrently.[4] Linda was also sentenced to a concurrent 364–day sentence for her conviction of false public alarm or report. She now appeals those convictions.

## III. DISCUSSION

### A. Evidentiary Challenges

#### 1. Standards of Review

 [¶ 24] Regarding challenges to evidentiary rulings, we review a trial court's rulings on relevance for clear error, *see State v. Mooney*, 2012 ME 69, ¶ 11, 43 A.3d 972, and on most other aspects of admissibility of evidence, we review for abuse of discretion, *see, e.g.*, M.R. Evid. 403; *State v. Mills*, 2006 ME 134, ¶ 8, 910 A.2d 1053. The judicial response to alleged discovery violations is also reviewed for an abuse of discretion. *State v. Reese*, 2010 ME 30, ¶ 14, 991 A.2d 806. For a jury verdict to be overturned on appeal based on an alleged discovery violation, the alleged violation must have prejudiced the defendant to the extent that it deprived her of a fair trial. *See id.*

[¶ 25] We address each of Linda's challenges to the court's evidentiary rulings and discern no error.[5]

#### 2. Admission of the Electronic Documents

 [¶ 26] Linda contends that the court erred when it allowed the admission of the undated documents in the Word file, entitled "Corinthians," found on her computer. The statements contained in the documents were offered as statements made by Linda, *see* M.R. Evid. 801(d)(2), and were therefore admissible if they were relevant, *see* M.R. Evid. 401, 402, they were authenticated, *see* M.R. Evid. 901(a), and their probative value was not substantially outweighed by the opposing factors set forth in Maine Rule of Evidence 403, *see* M.R. Evid. 403.

[¶ 27] The evidence was directly relevant to Linda's state of mind, planning, and motivations, and the court did not err in its relevance determinations. *See* M.R. Evid. 401, 402. To authenticate the documents containing the statements, the State presented evidence that it was stored on a computer that was taken from Linda's bedroom and that the computer user name was "Linda." The testimony from the officer at the computer crime lab was sufficient to support the allegation that Linda had drafted and had control of the documents. *See* M.R. Evid. 901(a) ("The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *State v. Berke*, 2010 ME 34, ¶ 11, 992 A.2d 1290 ("The [authentication] standard embodies a flexible approach to authentication reflecting a low burden of proof." (quotation marks omitted)). Moreover, because the documents included content concerning Linda and Jeffrey's recent separation, they could be authenticated in conjunction with other evidence that had already been admitted. *See* M.R. Evid. 901(b)(4); *see, e.g., Berke*, 2010 ME 34, ¶¶ 12–17, 992 A.2d 1290. Fi-

---

4. The court also ordered Linda to pay $15,000 as restitution.

5. Linda raised timely objections to the admissions of evidence and alleged discovery violation, thereby triggering harmless error review if error did in fact occur. *See* U.C.D.R.P.-Cumberland County 52(a). Because we conclude that the trial court properly admitted the challenged evidence, harmless error review is inapplicable.

nally, the court did not abuse its discretion in determining that the probative value was not substantially outweighed by any risk of unfair prejudice. *See* M.R. Evid. 403; *State v. Patton*, 2012 ME 101, ¶ 24, 50 A.3d 544 ("The Rule does not prevent the introduction of all prejudicial evidence, but only evidence that is *unfairly* prejudicial.") Thus, the court did not err in admitting the documents found in the "Corinthians" Word file.

### 3. Evidence of Linda's Relationship with Jeffrey's Daughters

█ [¶ 28] Contrary to Linda's contention, the court did not err in allowing the brief, contextual testimony regarding Linda's strained relationship with Jeffrey's daughters.[6] Prior to trial, the court appropriately limited old or extensive evidence on the issue because it was unfairly prejudicial, of limited probative value, and would result in a waste of time. However, the evidence that was admitted through Jeffrey's testimony at trial was relevant because it clarified what he meant by his statement that the marriage "wasn't working." Furthermore, in this context, the evidence was not prejudicial. *See* M.R. Evid. 403; *State v. Hurd*, 360 A.2d 525, 527 n. 5 (Me.1976) ("[P]rejudice . . . means more than simply damage to the opponent's cause. . . . What is meant . . . is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." (quotation marks omitted)).

### 4. Expert Opinion Regarding Bloody Footprints

█ [¶ 29] Linda argues that the State's expert witness, Alicia Wilcox, improperly testified as to her opinion concerning how certain footprints discovered at the crime scene were created, contending that the presentation of Wilcox's testimony constituted a discovery violation because, Linda asserts,[7] that specific opinion was not included in the expert report that was provided prior to trial. She argues that this alleged violation caused prejudice because she was not prepared to cross-examine Wilcox's expert opinion.

[¶ 30] The court did not abuse its discretion in (1) allowing Wilcox to give her opinion on how the bloody footprints found in Jeffrey's room were likely made and (2) denying Linda's request to strike the testimony from the record. The court permitted Wilcox to testify as to her expert opinion based on observations made during her investigation of the crime scene. Linda had been provided with Wilcox's expert report. Wilcox testified that the report included the photographs taken at the crime scene, evidence that Wilcox used to form her opinion at trial. Furthermore, Linda's own expert had an opportunity to review all of the DNA evidence and related reports. Because the State provided Linda with the Wilcox report along with the evidence forming the basis of the report, and Linda's own expert also reviewed this material, she was not prejudiced by the expert opinion regarding the footprints. *See State v. Mannion*, 637 A.2d 452, 454 (Me.1994) ("The purpose of [pretrial discovery] is to prevent unfair surprises at trial." (quotation marks omitted)); *State v. Cook*, 581 A.2d 415, 417 (Me.1990) (explaining that a court's decision not to exclude evidence as a sanction for a discovery violation is reviewed for abuse of discretion where the "appellant must show

---

6. Because the trial court properly allowed the testimony regarding the relationship between Linda and Jeffrey's daughters, Linda's claim that the prosecutor elicited inadmissible evidence is without merit.

7. Our review is limited by the fact that the report itself was apparently not made part of the court's record.

that [s]he was, in fact, prejudiced by the . . . violation and that the prejudice rose to the level of depriving [her] of a fair trial").

## B. Allegations of Prosecutorial Misconduct

### 1. Standards of Review

#### a. Preserved and Unpreserved Errors

[¶ 31] The importance of bringing alleged error, including prosecutorial misconduct, immediately to the attention of the trial court is manifested in the standards of review for errors that were objected to at trial and those that were unpreserved. *Compare* M.R.Crim. P. 52(a), *with* M.R.Crim. P. 52(b).[8] Maine Rule of Criminal Procedure 52 provides:

> **(a) Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

> **(b) Obvious Error.** Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

*See also* M.R. Evid. 103(e) (providing that an appellate court may take "notice of obvious errors affecting substantial rights although they were not brought to the attention of the court").

#### i. Application of Harmless Error Inquiry to Prosecutorial Misconduct

 [¶ 32] When an objection has been made to a prosecutor's statements at trial, we review to determine whether there was actual misconduct, *see State v. Clark,* 2008 ME 136, ¶ 7, 954 A.2d 1066, and, if so, whether the trial court's response remedied any prejudice resulting from the misconduct, *cf. State v. Hinds,* 485 A.2d 231, 237 (Me.1984) (applying obvious error review and stating that curative instructions may be sufficient to remedy instances of prosecutorial misconduct). We generally defer to "the determination of a presiding Justice, who has the immediate feel of what is transpiring, that a curative instruction will adequately protect against the jury's giving consideration to matters which have been heard but have been stricken as evidence." *See State v. Conner,* 434 A.2d 509, 512 (Me.1981) (quotation marks omitted). Any concern created by improper statements made by a prosecutor is likely to be cured by a prompt and appropriate curative instruction, especially when such an instruction is " 'specifically addressed to the prosecutor's misconduct.' " *See* Robert W. Clifford, *Identifying and Preventing Improper Prosecutorial Comment in Closing Argument,* 51 Me. L.Rev. 241, 266 (1999) (quoting *State v. Reilly,* 446 A.2d 1125, 1129 (Me.1982)). Finally, we determine whether, if error exists, it was harmless. *See* M.R.Crim. P. 52(a); *Clark,* 2008 ME 136, ¶ 7, 954 A.2d 1066.[9] "Only where there are exceptionally prejudicial circumstances or prosecutorial bad faith will a curative

---

8. The specific Portland Unified Criminal Docket Rule of Procedure that is applicable here is identical to Maine Rule of Criminal Procedure 52. *Compare* U.C.D.R.P.-Cumberland County 52, *with* M.R.Crim. P. 52.

9. A trial court's response to prosecutorial misconduct is often discussed conjointly with the analysis of potential prejudice as part of harmless error review. *See, e.g., United States v. De La Paz–Rentas,* 613 F.3d 18, 25 n. 2 (1st Cir.2010); *cf. United States v. Kasenge,* 660 F.3d 537, 542 (1st Cir.2011) (stating that obvi-

ous error analysis—called "plain error" analysis in the federal courts—requires a reviewing court to consider "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) *whether the judge gave curative instructions and the likely effect of such instructions;* and (4) the strength of the evidence against the defendants." (emphasis added) (quotation marks omitted)).

instruction be deemed inadequate to eliminate prejudice." *State v. Bennett,* 658 A.2d 1058, 1063 (Me.1995) (quotation marks omitted).

[¶ 33] Harmful error is error that affects the "criminal defendant's substantial rights," *see State v. Pabon,* 2011 ME 100, ¶ 34, 28 A.3d 1147, meaning that "the error was sufficiently prejudicial to have affected the outcome of the proceeding," *id.* (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). We determine the effect of error by looking to "the totality of the circumstances, including the severity of the misconduct, the prosecutor's purpose in making the statement (*i.e.,* whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative instructions." *United States v. De La Paz–Rentas,* 613 F.3d 18, 25 n. 2 (1st Cir.2010) (quotation marks omitted).

[¶ 34] The State carries the burden of persuasion on appeal when our review is for harmless error. *See Olano,* 507 U.S. at 734, 113 S.Ct. 1770. When prosecutorial misconduct that was objected to has not been addressed or only insufficiently addressed by the court, the State must persuade us that "it is highly probable that the jury's determination of guilt was unaffected by the prosecutor's com-

ments." [10] *Clark,* 2008 ME 136, ¶ 7, 954 A.2d 1066 (quotation marks omitted).

ii. Application of Obvious Error Inquiry to Prosecutorial Misconduct

[¶ 35] In contrast, when a defendant has not objected to statements made by the prosecutor at trial, and subsequently asserts on appeal that those statements constituted prosecutorial misconduct that deprived her of a fair trial, we review for obvious error. *See* M.R.Crim. P. 52(b); M.R. Evid. 103(e); *State v. Pelletier,* 673 A.2d 1327, 1330 (Me.1996). To demonstrate obvious error, the defendant must show that there is "(1) an error, (2) that is plain, and (3) that affects substantial rights." *Pabon,* 2011 ME 100, ¶ 29, 28 A.3d 1147; *see Olano,* 507 U.S. at 734, 113 S.Ct. 1770. Even if these three conditions are met, we will set aside a jury's verdict only if we "conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Pabon,* 2011 ME 100, ¶ 29, 28 A.3d 1147.

[¶ 36] If the defendant, having failed to preserve the objection at trial, demonstrates on appeal that there was prosecutorial misconduct that went unaddressed by the court, the defendant has met the burden of demonstrating error. The next question is whether the error was "plain." An error is plain if the "error is [so] clear under current law," *Olano,* 507

10. As we explained in *State v. True,* "The test of whether an error is or is not harmless ... is ... difficult to articulate." 438 A.2d 460, 467 (Me.1981). The complexity of the harmless error inquiry is in part due to the fact that the *type of error* determines the discretion afforded to an appellate court in affirming or vacating a conviction. *See Arizona v. Fulminante,* 499 U.S. 279, 306–12, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *see also Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Reviewing courts must first distinguish between constitutional and statutory errors. *See United States v. Lane,* 474 U.S. 438, 460–61, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (Brennan, J., concurring in part and dissenting in part). Constitutional errors are further divided between structural errors and trial errors. *See Fulminante,* 499 U.S. at 306–12, 111 S.Ct. 1246. Because the statements presented here do not present "constitutional error," except possibly in their cumulative effect, we do not discuss the distinction between structural and trial errors.

U.S. at 734, 113 S.Ct. 1770, that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it," *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

 [¶ 37] If the first two elements of the obvious error test are met, we next consider whether the defendant has demonstrated a reasonable probability that the error affected her substantial rights. *Pabon*, 2011 ME 100, ¶ 35, 28 A.3d 1147. "[A]n error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* ¶ 34.

 [¶ 38] The defendant's burden here is significant. When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding. *See United States v. Procopio*, 88 F.3d 21, 31 (1st Cir.1996) ("The fact that the defense did not object also may suggest that, in the conditions of the courtroom, the [prosecutor's statements during rebuttal] passed by as mere rhetoric."); *State v. Cleaves*, 2005 ME 67, ¶ 13, 874 A.2d 872 ("Obvious error review provides no invitation to change trial and instruction request strategy when the results of the original strategy turn out less favorably than hoped

for."); *cf. Clark*, 2008 ME 136, ¶ 7, 954 A.2d 1066 ("Trial counsel's failure to object to the inadmissible evidence, whether as a result of tactical decision or oversight, will itself be a consideration in determining whether the error is obvious and highly prejudicial." (quotation marks omitted)).

### b. Distinction Between Harmless and Obvious Error

 [¶ 39] Accordingly, there is a significant distinction between the required showing needed to vacate a jury verdict based on an error that was brought to the court's attention by an objection at trial, and one that was not preserved.[11] Most notably, the State has the burden of persuasion on appeal in a harmless error analysis. *See Olano*, 507 U.S. at 734, 113 S.Ct. 1770. In contrast, the burden rests with the defendant in an obvious error analysis as a result of the defendant's decision not to object or failure to do so. *See id.* This distinction is designed to encourage the defendant to bring objections to the trial court's attention promptly so that any prejudice can be remedied during the proceedings, or in cases where prejudice cannot be remedied, a mistrial can quickly be ordered. Once a jury has been given a case and has done its work in deliberating and deciding on guilt or innocence, serious and manifest injustice must be present before we will set such a verdict aside; we

---

11. We are cognizant of the challenges to counsel when a decision must be made regarding objections to opposing counsel's arguments. Nonetheless, an objection must be made within a reasonable time of the offending comments to be preserved. *See* Alexander, *Maine Appellate Practice* § 402 at 214 (3d ed.2008) (stating that "[a]n issue is deemed to be raised or preserved if there was a sufficient basis in the record to alert the trial court ... and any opposing party to the existence of that issue" (quotation marks omitted)). The requirement is to object at a time when the

court retains the ability to provide a meaningful corrective instruction. *See State v. Dube*, 522 A.2d 904, 908–09 (Me.1987) (explaining the importance of specific and contemporaneous objections to allow the "presiding justice ... the opportunity to eliminate or minimize any prejudicial effect [of alleged errors] with curative instructions or other appropriate measures"). To do so, counsel may request a side bar conference, may note a continuing objection to a repeated problem, or may wait a short time in order not to "throw the skunk into the jury box."

will not do so lightly. *See United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147; *see also State v. Pomerleau*, 363 A.2d 692, 697 (Me.1976) ("[T]he judgment of conviction may be permitted to stand despite the existence of prejudicial constitutional error *not appropriately saved for appellate scrutiny*" unless the reviewing court determines that vacating the judgment is necessary "to maintain a basic integrity in judicial proceedings [and prevent] a conviction produced by a trial fundamentally unfair.").

2. Identifying Prosecutorial Misconduct [12]

[¶ 40] The role of the prosecutor in criminal prosecutions, similar to that of all attorneys in litigation, requires a balancing of professional responsibilities that can be challenging. *See* Clifford at 258–59. Although the prosecutor is responsible for the unflinching and assertive efforts to prosecute those who are alleged to have committed crimes, those efforts must be tempered by a level of ethical precision that avoids overreaching and prevents the fact-finder from convicting a person on the basis of something other than evidence presented during trial. *See id.* In the context of arguments to a jury, those ethical obligations require a prosecutor to avoid inviting a jury to make its decision based on bias, prejudice, conjecture, or any other impermissible basis. *See id.* at 258–60.

[¶ 41] These competing obligations require prosecutors to walk a careful line. As is now a familiar description of the prosecutor's authority, a prosecutor may "use wit, satire, invective and imaginative illustration in arguing the State's case" and may "present an analysis of the evidence in summation with vigor and zeal." *State v. Weisbrode*, 653 A.2d 411, 416 (Me. 1995) (quotation marks omitted). A prosecutor is, however, imbued with a special responsibility in representing the State and "has a responsibility to help ensure a fair trial." *State v. Lockhart*, 2003 ME 108, ¶ 48, 830 A.2d 433 (quotation marks omitted). "[A]lthough permitted to strike hard blows, [a prosecutor] may not strike foul ones." *Id.* (quotation marks omitted). "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *Young*, 470 U.S. at 7, 105 S.Ct. 1038. Thus, when allegations based on prosecutorial misconduct are raised, trial and appellate courts must assess whether wit, invective, and zeal have crossed the line into the realm of "foul blows." "The central question is whether the [prosecutor's] comment is fairly based on the facts in evidence." *State v. Pendexter*, 495 A.2d 1241, 1241 (Me.1985).

[¶ 42] There are specific types of statements that a prosecutor should avoid making in the jury's presence. These admonitions are not new.[13] Existing case law

---

**12.** Here, we consider only allegations of prosecutorial misconduct arising from a prosecutor's statements made in front of the jury, typically during opening statements or closing arguments, but which occasionally are made during witness examination or colloquies with the court or opposing counsel. We do not address allegations of prosecutorial misconduct that arise in other contexts, such as in claims that a prosecutor withheld evidence favorable to the defense and material to the defendant's guilt or punishment, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Gould*, 2012 ME 60, ¶ 22 & n. 4, 43 A.3d 952 (quoting *Smith v. Cain*, 565 U.S. ——, ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012)), or that a prosecutor has solicited or presented false testimony, *see State v. Willoughby*, 507 A.2d 1060, 1069 (Me. 1986).

**13.** For example, Maine Rule of Professional Conduct 3.4(e) prohibits a lawyer, during trial, from

allud[ing] to any matter that the lawyer does not reasonably believe is relevant or

enumerates several types of statements made by a prosecutor, or defense counsel,[14] that will almost always be placed into the category of "misconduct," including the following:

- Misrepresenting material facts in the record or making statements of material fact unsupported by any evidence, *see, e.g., United States v. Gentles*, 619 F.3d 75, 81 (1st Cir.2010); *United States v. Azubike*, 504 F.3d 30, 38 (1st Cir.2007); *United States v. Joyner*, 191 F.3d 47, 53–54 (1st Cir.1999); *State v. Gould*, 2012 ME 60, ¶ 17, 43 A.3d 952;

- Using the authority or prestige of the prosecutor's office to shore up the credibility of a witness, sometimes called "vouching," *see State v. Williams*, 2012 ME 63, ¶ 46, 52 A.3d 911;

- Shifting the burden of proof on an issue to the defendant, *see United States v. Glover*, 558 F.3d 71, 76–79 (1st Cir.2009);

- Making statements pandering to jurors' sympathy, bias, or prejudice, *see State v. Burgoyne*, 452 A.2d 393, 396–97 (Me.1982);

- Injecting personal opinion regarding the guilt or credibility of the accused or other witnesses, *see State v.*

*Schmidt*, 2008 ME 151, ¶¶ 16–17, 957 A.2d 80; and

- Making unfounded and inflammatory attacks on the tribunal or opposing counsel, *see, e.g., Young*, 470 U.S. at 10 [105 S.Ct. 1038].

[¶ 43] Although this is not an exhaustive list, it encompasses many of the types of statements that will likely constitute prosecutorial misconduct in a criminal trial. In each instance, the core element of the offending statement is that it urges or encourages the jury to make its decision based on something other than the facts that have been properly presented at trial and reasonable inferences that can be drawn from those facts. *See State v. Moontri*, 649 A.2d 315, 317 (Me.1994) ("A lawyer is permitted to argue on his analysis of the evidence, for any position or conclusion with respect to the matters stated therein, and the central question is whether the comment is fairly based on facts in evidence." (citation omitted) (quotation marks omitted)).

 [¶ 44] Both the trial court and the appellate court must view allegations of prosecutorial misconduct in the overall context of the trial. *See Gould*, 2012 ME 60, ¶¶ 14–21, 43 A.3d 952. This includes taking into account the statements, comments, and strategy of the defense, especially when the prosecutor's

---

that will not be supported by admissible evidence, assert[ing] personal knowledge of facts in issue ..., or stat[ing] a personal opinion as to the justness of a cause, the credibility of a witness, ... or the guilt or innocence of an accused.

**14.** Although the State's inability to appeal from an acquittal effectively precludes the development of extensive appellate jurisprudence on the question of defense counsel misconduct, trial courts have a responsibility to assure that *both* attorneys avoid inviting the jury to make decisions based on bias, prejudice, misstatements of the law or facts, or personal opinions of counsel. These obli-

gations are articulated in the Maine Rules of Professional Conduct 3.3(a) and 3.4(e) and are applicable to all attorneys in trials so that they do not " 'encourage[ ] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.' " *Seabury–Peterson v. Jhamb*, 2011 ME 35, ¶ 15, 15 A.3d 746 (quoting *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir.1988)). "It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds." *United States v. Young*, 470 U.S. 1, 8, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

statements are made in response to the theory, argument, or provocation of the defendant or defense counsel. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (stating that a court may consider whether "[m]uch of the objectionable content was invited by or was responsive to" comments made by defense counsel to determine the effect on the trial as a whole); *United States v. Mejia–Lozano,* 829 F.2d 268, 274 (1st Cir.1987) (noting that prosecutors are provided with "somewhat greater leeway" when responding "to defense counsel's inflammatory statements" (quotation marks omitted)). The mere existence of a misstatement by a prosecutor at trial, or the occasional verbal misstep, will not necessarily constitute misconduct when viewed in the context of the proceedings. *See State v. Corrieri,* 654 A.2d 419, 422 (Me. 1995) (concluding that a prosecutor's "ill-chosen words" during closing "within the context of the entire three day trial, did not affect the jury's determination or [the defendant's] right to a fair trial").

[¶ 45] With these standards in mind, we turn to the alleged prosecutorial misconduct in the matter before us.

### 3. The Misconduct Alleged Here

[¶ 46] We address several instances in which Linda argues that the prosecutor rendered the trial unfair through her statements in front of the jury including: (a) a comment about the weight of the bat used to assault Jeffrey, (b) statements about the whimpering dog heard on the tape of the 911 call, (c) multiple statements during argument prefaced with the words "I think," (d) comments concerning the credibility of Linda and defense counsel, and (e) urging the jury to "do justice."

[¶ 47] We look first to the overall context of the trial, examining the evidence itself. Although we conclude that there is sufficient evidence to support the verdict, the evidence supporting the conviction is entirely circumstantial. There were no eyewitnesses other than Linda and Jeffrey, and Linda has steadfastly denied having anything to do with the assault. She did not testify at the trial, and Jeffrey has no memory of the critical events that occurred on the night when he was assaulted. There is, however, nothing inherently unfair about a verdict based on circumstantial evidence. *See State v. Moores,* 2009 ME 102, ¶ 10, 982 A.2d 318. Premeditated violent crimes are rarely committed when witnesses are present.

[¶ 48] The second aspect of contextual review relates to the contentious relationship between counsel for the prosecution and counsel for the defendant. Although trials are often tense, and occasional verbal disputes are not unusual, the acrimony between opposing counsel in this case posed a significant challenge to the trial court.[15] *Cf. Young,* 470 U.S. at 10, 105 S.Ct. 1038 (explaining "the larger duty of counsel to avoid acrimony in relations with opposing counsel during trial and confine argument to record evidence" (quotation marks omitted)). To the extent that the dynamic became clear to the jury, it may have provided a context for some of the more pointed comments made by both counsel in their arguments.

### a. Statement Regarding the Bat

■ [¶ 49] We begin with the prosecutor's statements during witness examination. Linda argues that the prosecutor's comment to the jury regarding the weight of the softball bat constituted the prosecu-

---

15. For example, unlike many trials, where counsel have met in advance of trial to sort through and identify exhibits, counsel in this matter had not conferred regarding the admission or redaction of important tapes before the first day of trial.

tor's own testimony. During her direct examination of Jeffrey, the jury heard the following exchange:

[Prosecutor]: How many times have you used this bat?

[Jeffrey]: Hundreds.

[Prosecutor]: Have other people used this bat?

[Jeffrey]: Yes.

[Prosecutor]: How many people have used this bat?

[Jeffrey]: Hundreds.

[Prosecutor]: Have any women used this bat?

[Jeffrey]: Over the years, yes. It's usually a little too heavy for them but they try.

[Prosecutor]: *I don't think it's too heavy.* All right, now, you said that Detective Ross showed you this bat a few months ago, right?

(Emphasis added.)

[¶ 50] Linda did not object at the time of the statement. The prosecutor did not express her opinion as to the weight of the bat at any other time during the trial and did not refer to her opinion about the bat's weight again.

[¶ 51] There is little question, however, that the prosecutor's statement, "I don't think it's too heavy," was plainly inappropriate because the prosecutor impeached her own witness's testimony. The victim himself had testified that the bat could have been too heavy for a woman to wield.

[¶ 52] Because Linda did not object to the prosecutor's comment at the time it was made, we consider the issue unpreserved, and we review for obvious error. M.R.Crim. P. 52(b); *Pelletier,* 673 A.2d at 1330. Utilizing the four-part test for obvious error set forth in *Pabon,* 2011 ME 100, ¶ 29, 28 A.3d 1147, we conclude that the prosecutor's comments do not rise to the

level of obvious error that would require us to vacate the jury's verdict.

[¶ 53] The first element of the obvious error test was satisfied in this instance. The prosecutor made a nearly testimonial statement that should have drawn a corrective instruction from the court. *See id.* That brings us to the next element— whether the error was plain. *See id.* We accept that it was plain error by assuming that the statement was heard by both the jury and the court, even though that is not certain from the record here. Nonetheless, Linda has failed the third element— demonstrating that the statement affected her substantial rights. *See id.* The prosecutor never referenced her own opinion of the bat's weight again, the comment occurred quickly and inconsequentially, and the bat was available for the jurors to feel for themselves its weight and heft. Given these facts, and considering the overall context of the trial, we conclude that Linda failed to demonstrate a reasonable probability that the prosecutor's statement affected her substantial rights, that is, that it affected the outcome of the trial. *See id.* ¶¶ 34–36.

### b. Statements Regarding the Dog

 [¶ 54] We now turn to the prosecutor's language during closing argument and rebuttal. Linda argues that the prosecutor committed misconduct by making comments during closing argument about what the dog, Zoe, was thinking.

[Prosecutor]: .... We know that she [the dog] was there for what I call the last blood shed event, the assault that you can hear on the 911 tape.... We know she was there for that, we hear her whimpering, we hear her crying, and when the police arrive she can't get out of that house fast enough, we know that.

[Defense Counsel]: .... There's no testimony to that, this dog was ever whim-

pering. I object to that as never [having] been presented.

THE COURT: Thank you. I remind the jury you are the finders of the fact and if the lawyer's discussion of the facts differs in any way or the evidence differs in any way from your recollection of the evidence it is your recollection that matters.

[Prosecutor]: .... What do you think Zoe [the dog] would do if Zoe is watching mommy beat daddy? Because that's what she saw, she saw mommy beat daddy. She couldn't wait to get out of the house.

[Defense Counsel]: .... [T]he idea that there's any evidence that the dog saw Linda beating Jeff. There's just no evidence in the case. I think this is improper argument.

. . . .

THE COURT: .... I will remind the jury again, you are the final arbiters of what the evidence was and it's what you remember not what the attorneys may suggest is the evidence that matters.

 [¶ 55] The challenged statements, which may be seen as the prosecutor's belief as to what a dog might have been thinking, can be categorized as misconduct because they are not based on evidence. When Linda objected, the court appropriately issued a curative instruction to the jury after each objection. Juries are presumed to have followed jury instructions, including curative instructions. *See Gentles*, 619 F.3d at 82; *State v. Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855. Even viewing the comments in the light of

greatest harm to Linda's right to a fair trial, the jury could not have taken the prosecutor's comments seriously as evidence. We conclude that the court's instructions were sufficient to remedy any prejudice that may have been caused by the prosecutor's anthropomorphic comments. *See Gentles*, 619 F.3d at 82; *Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855.

### c. The Prosecutor's Use of the Phrase "I Think"

 [¶ 56] Linda also asserts that it was misconduct for the prosecutor to repeatedly use the phrase "I think" when reviewing the evidence with the jury during her closing statement and rebuttal. The phrase should be avoided, *Gentles*, 619 F.3d at 84, and we conclude that the prosecutor committed misconduct by the use of words that could have been understood by the jury to present the prosecutor's personal opinion during the closing argument.

[¶ 57] Linda appropriately objected on multiple occasions to the prosecutor's use of the term "I think" therefore triggering harmless error analysis if the comments resulted in error. *See* M.R.Crim. P. 52(a). The prosecutor used the term "I think" approximately twenty-three times during the course of her closing argument and rebuttal. The defense attorney used the same phrase during closing argument approximately thirty-one times. We look to the court's actions in responding to the objections to determine whether there is any risk of prejudice and, therefore, error to review.[16] *See Gentles*, 619 F.3d at 82; *Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855.

---

16. Not every use of the phrase "I think" was improper. Many of the occasions on which the prosecutor and defense attorney used that phrase were not necessarily proffers of personal opinion. For example, in one instance the prosecutor was unsure of a specific time frame, saying, "If you read ... what we call the Corinthians document ... it was written between March *I think* it's 17th to April 4th." (Emphasis added.) Later in her closing argument the prosecutor commented on the evidence, stating, "But *I think* the evidence suggests that [the softball bat was put in the fireplace on the night Jeffrey was attacked]."

[¶ 58] By the end of arguments, the court had admonished the prosecutor more than once to stop using the phrase, both after objections from Linda and sua sponte. The court rebuked the prosecutor in front of the jury in addition to providing the appropriate curative instruction, reminding the jurors that it was their determination of the facts, not the opinion of the prosecutor, that mattered. The court's admonitions and curative instructions were correct and were proportionate to the offending language. On this record, where both counsel used the phrase regularly, we are confident that those instructions were sufficient to remedy any impropriety caused by the prosecutor's comments. *See United States v. Rodriguez,* 675 F.3d 48, 63 (1st Cir.2012). Accordingly, we hold that the court appropriately addressed the misconduct and no error occurred.

d. Comments Concerning the Credibility of Linda and Defense Counsel

 [¶ 59] Linda asserts that the prosecutor improperly attacked the credibility of Linda and her counsel on several occasions. During closing, the prosecutor referred to Linda as "Ms. Fiction Writer" and asserted when she called the police on the night of the attack that she was "filing a false report for her story, her fiction that somebody else came in and did this."

 [¶ 60] Although it is not error for the prosecutor to ask the jury to address the evidence that contradicted Linda's theory of the case, these statements were improper to the extent they suggested the prosecutor's opinion of Linda's credibility. *See Williams,* 2012 ME 63, ¶ 46, 52 A.3d 911 ("At trial, an attorney is prohibited from commenting on his or her personal

opinion as to the credibility of a witness."); *see also* M.R. Prof. Conduct 3.4(e). Because Linda did not contemporaneously object to these statements, we apply obvious error review. *See* M.R.Crim. P. 52(b); *Pelletier,* 673 A.2d at 1330. Given the brief nature of these comments, the strong response by defense counsel in Linda's closing argument, the duration of trial and amount of evidence presented, and the careful manner in which the judge instructed the jury, we conclude that Linda has failed to demonstrate a reasonable probability that the "Ms. Fiction Writer" comments affected the jury's verdict. *See Pabon,* 2011 ME 100, ¶ 35, 28 A.3d 1147.

 [¶ 61] Linda also claims that the prosecutor improperly attacked the credibility of defense counsel. The prosecutor's comments concerned the testimony of Christine Waterhouse, a forensic DNA analyst at the Maine State Police Crime Lab, who testified for the State. Waterhouse testified about DNA samples recovered from clothing and from the scene of the crime. Defense counsel used a chart summarizing Waterhouse's findings to aid in cross-examination but did not seek to admit the chart as evidence. The State objected to defense counsel's use of the chart, claiming it "le[ft] out stuff and it is inaccurate." The court overruled the State's objection, allowing Linda to use the chart for examination purposes and permitting the State to point out inaccuracies on redirect. The record indicates that the chart depicted areas of the crime scene and items of evidence from which police took DNA samples that Waterhouse later examined. As defense counsel questioned Waterhouse, counsel placed marks next to the items depicted on the chart.[17]

---

(Emphasis added.) Sometimes, the phrase was used simply as a rote introduction to the next concept: "Well, *I think* I am going to play the tape." (Emphasis added.)

17. Linda did not offer the chart as an exhibit. Based on the trial transcript, it appears that defense counsel would mark off boxes indicating which person's DNA was found on the

[¶ 62] On redirect, the prosecutor allowed Waterhouse to point out information on the graph that she, the witness, believed was inaccurate. The prosecutor asked to allow Waterhouse to make corrections to the chart using a marker. Linda objected. The court sustained the objection but allowed Waterhouse to comment on the chart.

[¶ 63] During rebuttal closing argument, the prosecutor stated,

> They also want you to ignore what Christine Waterhouse said. Yes, they blew this up, too, they can blow this up big, but you know what, Christine Waterhouse went through basically every line and said that is not accurate, that is not accurate, that is not accurate. And when I asked her, well, do you mind if I fix this? *Oh, no, no, Ms. [Prosecutor], we don't, we don't want the truth on this,* we don't want that, just put this exhibit in regardless of the fact that Christine Waterhouse said that's not accurate, put it in anyway.

(Emphasis added.)

[¶ 64] Because Linda did not object to the prosecutor's statements, we again review for obvious error. *See* M.R.Crim. P. 52(b). First, we determine whether the prosecutor's statements constituted misconduct that went unaddressed by the court, and, therefore, error. *See Clark,* 2008 ME 136, ¶ 7, 954 A.2d 1066. To assess harmfulness we "must not only weight the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *Young,* 470 U.S. at 12, 105 S.Ct. 1038. A key consideration is whether "the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale.'" *Id.* at 12–13, 105 S.Ct.

1038. "[S]uch comments would not warrant reversing a conviction." *Id.* at 13, 105 S.Ct. 1038.

[¶ 65] Here, the prosecutor's statements were made in response to defense counsel's closing argument where he spoke at length about Waterhouse's testimony during cross-examination and the DNA evidence. At one point during closing, defense counsel stated,

> There's no DNA of Linda's on the trigger, the trigger that she's supposed to have shot the gun twice with no Linda DNA. She shot it twice *according to the DA's fictional account. Well, how come it's not on there?* You can't pick and choose this evidence. As you see, *you can't cherry pick this evidence,* you got to take it from where it is. It's their lab. But guess what, also there's male DNA on that trigger. *Come on, folks, if you have any doubts up to this point look that over, get your coats on and go home.* Who is that? If she fired the gun twice, as Ms. Anderson said, how come she didn't put any DNA on the trigger and some unidentified person … did? And on the grip or butt of the gun, Jeff, Linda and, again, another unidentified male. These are males. Unfired cartridges, two males. That stuff won't go away. Those, folks, you can bend them, you can twist them, you can spit 'em, but, boy, they don't go away.

(Emphasis added.)

[¶ 66] Assuming that the prosecutor's misconduct was obvious, i.e., "plain" in this context, we conclude that Linda has failed to show a reasonable probability that the error affected the outcome of the trial. Because "the prosecutor's remarks were 'invited,' and did no more than respond

---

tested items. For example, a mark might correspond to the DNA of Jeffrey, Linda, family members, or unknown males or females found on a particular piece of evidence or at a specific location.

substantially in order to 'right the scale,'" those "comments [do] not warrant reversing [the] conviction." *Young,* 470 U.S. at 12–13, 105 S.Ct. 1038.

### e. Urging the Jury to "Do Justice"

[¶ 67] Linda also contends that the prosecutor engaged in misconduct by urging the jury to "do justice." During her closing argument, the prosecutor stated,

> [Jeffrey] also told you that he didn't think he would get justice in the Court. Ladies and gentlemen, prove him wrong. Do justice. Return a verdict that is reasonable and that speaks the truth, that's consistent with the evidence and your common sense, and *a verdict that does justice, and there's only one verdict here that does that, this was Linda Dolloff no intruder.* It's one or the other. There is no reasonable evidence that anyone other than Linda did this. She had the motive, she had the opportunity. The time for justice is now. And it's in your hands.

(Emphasis added.) The prosecutor ended her rebuttal argument on a similar note:

> And it is important that you get this right. It's important that you render a verdict without regard to personal bias or emotion, without regard to the consequences to either Linda or to Jeffrey or to anyone else. It's important that you do justice. It's important that your verdict speak the truth and the truth is you can find in the evidence more than beyond a reasonable doubt that Linda Dolloff committed these offenses, it is not reasonable that it was anybody else.

[¶ 68] In exhorting the jury to convict, which is not, standing alone, misconduct, references to doing justice by conviction should be avoided. *See De La Paz–Rentas,* 613 F.3d at 26 (warning that "[t]he 'do your duty' rhetoric, depending on wording and context, can be used to convey the idea to the jury that their job is to convict").

[¶ 69] Here, even assuming the comments constituted misconduct that the court should have addressed, they did not affect Linda's substantial rights. *See* M.R.Crim. P. 52(b). Linda did not object to these comments, and she has not carried her burden of showing a reasonable probability that the "do justice" rhetoric affected the outcome of the proceeding. *See Pabon,* 2011 ME 100, ¶ 35, 28 A.3d 1147. The jurors rendered their verdict after a fifteen-day trial where they heard live testimony from nineteen different witnesses. The record contains physical evidence such as the bat used in the attack on Jeffrey; the .22 caliber Ruger semi-automatic handgun used to shoot Linda; bullet casings from shots fired on the night of the attack; Linda's shirt and pants from that night; a recording of Linda's 911 call and a recording of a later call between Jeffrey and Linda; computer documents; aerial photographs and diagrams of the Dolloffs' residence; and photographs of the crime scene. The evidence in this case is substantial, even if circumstantial.

[¶ 70] Moreover, although the prosecutor told the jury that only a guilty verdict would "do justice," the statements preceding and following this rhetoric provide important context. For example, the prosecutor said, "Return a verdict that is reasonable and that speaks the truth, that's consistent with the evidence and your common sense." The prosecutor also stated, "It's important that you render a verdict without regard to personal bias or emotion, without regard to the consequences to either Linda or to Jeffrey or to anyone else."

[¶ 71] Context is again important. As these comments show, and as has already been discussed, both the prosecutor and

defense counsel vigorously litigated this case. During closing, defense counsel told the jury that "when you vote in the jury room for a case like this, your vote saves or it can destroy lives." Defense counsel continued, "And you know everybody in a trial, and this trial ... has an agenda.... The district attorney has an interest in the outcome of this case. She gets elected every few years. It looks good to constituents, keep her job, but you have no interest in the outcome of the case except I believe to *do justice.*" (Emphasis added.) Linda's attorney had an opportunity to remind the jury to focus on the evidence: "[W]ith the help of the DA who asks the leading question what happened next after you saw the shadow in the window, the shadow ... disappeared. But not for us. That may happen with police circles, may happen with DAs, but we talk about the evidence not what it does to help our case."

[¶ 72] Finally, and most importantly, the trial judge issued curative instructions in response to perceived prosecutorial misconduct during closing argument and rebuttal, and took special care to properly instruct the jury before deliberation began. Regarding statements made by the lawyers, the judge cautioned the jury:

> In particular, please remember neither the opening statements nor the closing arguments of the attorneys are evidence in this case. As advocates the attorneys are allowed to discuss the evidence with you and to suggest various inferences or conclusions that you might draw from the evidence.... [I]t is important to remember that ultimately it is your recollection of the evidence and the perspective that you develop during your deliberations that counts.

We presume that a jury follows a curative instruction unless "there are exceptionally

prejudicial circumstances or prosecutorial bad faith."[18] *See State v. Wood,* 662 A.2d 908, 912 (Me.1995); *see also Gentles,* 619 F.3d at 82 ("It is a well established tenet of our judicial system that juries are presumed to follow ... instructions [given during the closing charge].").

[¶ 73] For all these reasons, we conclude that Linda has failed to carry her burden of showing a reasonable probability that the prosecutor's urgings to "do justice" affected the outcome of this case or deprived Linda of a fair trial.

#### 4. Cumulative Effect of Misconduct

[¶ 74] Because Linda asserts multiple instances of prosecutorial misconduct, we review the serious instances cumulatively and in context to determine whether Linda received an unfair trial that deprived her of due process. *See* U.S. Const. amend. XIV, § 1; Me. Const. art. I, § 6–A. Multiple "incidents of prosecutorial misconduct, none of which individually would require reversal, taken together may have a cumulative effect" of violating a defendant's right to a fair trial. *United States v. Mooney,* 315 F.3d 54, 61 (1st Cir.2002).

[¶ 75] Linda had the assertive assistance of counsel, she was able to present witnesses on her own behalf, and she thoroughly challenged all of the State's witnesses. The trial court admonished the prosecutor in front of the jury for using the phrase "I think" during closing argument and rebuttal. Furthermore, the court carefully instructed the jury as to the appropriate legal standard and evidence to be considered. The court specifically told the jury that the closing arguments of counsel were not evidence and that "ultimately it is your recollection of the evidence and the perspective that you

18. We find no evidence in this case of prose- cutorial bad faith.

develop during your deliberations that counts."

[¶ 76] A properly instructed jury convicted Linda Dolloff after a lengthy trial. The evidence in this case was sufficient to support a guilty finding. Our ultimate task in reviewing for both harmless error and obvious error is to determine whether Linda received a fair trial. Having reviewed all of Linda's many challenges, we are not persuaded that any prosecutorial misconduct, even considered cumulatively, affected the jury's verdict. Thus, we conclude that Linda received a fair trial.

The entry is:

Judgment affirmed.