MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2013 ME 98
Docket:       Cum-12-198
Argued:       February 13, 2013
Decided:      November 12, 2013

Panel:        SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and
              JABAR, JJ.
Majority:     SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.
Dissent:      JABAR, J.

STATE OF MAINE

v.

SAMADI M. HASSAN

LEVY, J.

[¶1]   Samadi M. Hassan appeals from a judgment of conviction for

aggravated assault (Class B), 17-A M.R.S. § 208(1)(B) (2012), criminal

threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209(1), 1252(4)

(2012), criminal restraint (Class D), 17-A M.R.S. § 302(1)(B)(1) (2012), and

violation of a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2012),

entered in the Unified Criminal Docket (*Moskowitz, J.*) following a jury trial.

Hassan challenges the admission of evidence related to the events that preceded his

arrest, as well as testimony regarding the methods the police used to compile a

photographic array that was shown to the victim.  He also contends that the

prosecutor's closing argument contained statements about the victim's credibility

2

that constituted prosecutorial misconduct and deprived him of a fair trial. We affirm the judgment.

## I. BACKGROUND

[¶2] "The following facts, viewed in the light most favorable to the State, rationally support the verdict." *State v. Dolloff*, 2012 ME 130, ¶ 3, 58 A.3d 1032.

A. The Crime

[¶3] At around 12:00 a.m. on July 1, 2011, the victim went to a Riverton Park apartment to purchase marijuana. She arrived to find a small party at the apartment, with at least six or seven people in attendance. One of the men at the party began pulling the victim's headscarf, which she wore for religious reasons, as well as her hair. The victim told the man to stop, but he proceeded to roughly pull the scarf until it came off the victim's head.

[¶4] The victim threatened to call the police if the man persisted. In response, a group of men and women pinned her to the ground and began kicking and hitting her. The victim was eventually able to stand up, and at some point a man in a red shirt began waving a knife at her. The victim was attempting to hold the man back when the knife struck her index finger, causing a laceration that went all the way to the bone.[1] The man wielding the knife then held the knife to the

---

[1] When the victim received medical treatment later that morning, medical staff also noted slight swelling on her left temple and "superficial abrasions to her left neck."

victim's throat and told her that he would kill her if she did not "shut up." The man then forced the victim to clean up the large amount of blood that had come from her finger, using a white T-shirt.

[¶5] The victim repeatedly asked to be allowed to go home, but the man refused to let her leave. Sometime around 6 or 7 a.m., the man allowed the victim to go outside to smoke a cigarette, at which point she fled to a convenience store located near the apartment. Once at the convenience store, the victim called 911 and reported that she had been assaulted and that she was bleeding.

[¶6] The police arrived to find the victim upset and shaking. The victim told police that while she was waiting for them to arrive, her aggressor had arrived at the convenience store in a blue Dodge with a Maine license plate.[2] She then directed the police to the apartment where she was assaulted.

B.    Events Preceding Hassan's Arrest

[¶7] Once at the apartment building, the police set up a perimeter around the building and then knocked on the door. After receiving no response, they attempted to look into the windows of the apartment, but the curtains and blinds were drawn. Officers could see shadows and movements through the windows of

---

[2] Police later located the vehicle at Riverton Park.

4

the apartment and believed that there might be a firearm inside. They evacuated other apartments in the building and sought a search warrant.

[¶8] Timothy Farris, a senior lead officer and crisis negotiator for the Portland Police Department, arrived at the apartment at approximately 7 a.m. Farris maintained an office in Riverton Park and was familiar with Hassan. Farris received information that Hassan was the man whom the victim had identified at the convenience store as her attacker. Farris called Hassan's cell phone number and spoke with him briefly. Hassan agreed to come out with the other people in the apartment but would not reveal the names of the people inside the apartment or say how many people were inside. After no one exited the apartment, Farris approached the residence in an armored police vehicle. Using the vehicle's public address system, he spoke to the apartment's occupants. Farris testified that those inside the building responded by taunting, yelling, and giving "the middle finger a few times." Farris observed that Hassan was one of the people taunting the police.

[¶9] At approximately 1 p.m., Farris and another officer, dressed in protective gear, approached the apartment and attempted face-to-face negotiations. Farris spoke with the people that were in the apartment, including Hassan, for about one hour until, finally, the occupants peacefully exited the building. Hassan was taken into custody. The police eventually obtained a search warrant, and in

the apartment they discovered a headscarf, some white T-shirts, two knives, and a red T-shirt with red stains.

[¶10]   Meanwhile, the victim went to the police station, where she was shown a photographic array of fifty-four men fitting the general description of her attacker.   After looking through each page of the array, the victim identified a photograph of Samadi Hassan as depicting the man who threatened her with a knife and cut her.

[¶11]   In November 2011, a grand jury indicted Hassan for one count of aggravated assault (Class B), 17-A M.R.S. § 208(1)(B); one count of criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209(1), 1252(4); one count of criminal restraint (Class D), 17-A M.R.S. § 302(1)(B)(1); and one count of violation of condition of release (Class E), 15 M.R.S. § 1092(1)(A).

C.    Hassan's Motion in Limine

[¶12]  Prior to trial, Hassan filed a motion in limine, which sought to exclude several strands of evidence, two of which are particularly relevant to the disposition of this appeal.   First, Hassan challenged the admission of evidence relating to the events that occurred between the time the police showed up at the apartment and the time that the occupants finally emerged from the apartment. Hassan contended that the evidence was not relevant, and that even if it was relevant, its probative value was outweighed by its highly prejudicial nature.

Second, Hassan argued that the court should exclude the State's anticipated trial testimony that the photographic array shown to the victim "exclusively contained photographs of men who the police believe are associated with criminal activity." The State agreed that at trial it would elicit testimony only on "the photographic lineup process" but not "where the photographs came from," and the court denied Hassan's motion.

## D. Trial

[¶13] A jury trial was held on February 14, 2012. During opening statements, the prosecutor told the jury that she expected the evidence to show, among other things, that Hassan was involved in what she characterized as "a police standoff for several hours." Hassan renewed his objection to this evidence, which was overruled. Following the objection, Farris testified in detail as to the events that occurred between when the police arrived at the apartment and when the occupants exited from the apartment. Hassan did not object to any of the specific testimony offered by Farris at trial.[3]

[¶14] The State also called the victim to the stand, and she identified Hassan as the man who had attacked her with the knife and had refused to let her leave the apartment. The victim also testified that her attacker wore the red shirt seized by

---

[3] Hassan's only objection was a hearsay objection to Farris's testimony about what Hassan said during the standoff.

the police, that the headscarf discovered at the apartment was the one she was wearing the night of the crime, and that the knife used in the assault looked similar to knives found in the apartment.

[¶15]  The State also introduced evidence that the victim identified Hassan as her attacker from the photographic array.  A police detective testified, without objection from Hassan, regarding the three types of photographic arrays that the police typically use and how the police compile the photographs in the array.  The detective stated that the police showed the victim the type of array that typically includes both arrest photographs and other types of photographs such as yearbook pictures and Department of Motor Vehicle (DMV) photographs.  The detective did not specify the source of the photograph of Hassan that was used in the photographic array, nor did the jury view the photographic array or Hassan's photograph from the array.

[¶16]  The defense, meanwhile, focused on the victim's credibility.  During opening statements, defense counsel stated that the victim "has told inconsistent stories to different parties," and suggested that the jury "pay close attention to credibility, believability and truthfulness."  On cross-examination of the victim, Hassan focused on inconsistencies between the victim's testimony and statements she made or allegedly made the morning of the crime.  During closing arguments, defense counsel again focused on the victim's credibility, stating, "I would submit

to you, the jury, that we really can't believe much [of] what comes out of [the victim]."

[¶17]  During her closing argument, the prosecutor reviewed the evidence presented in the case and asserted that the jury should find the victim credible because the evidentiary photographs and the medical records corroborated the victim's testimony.  The prosecutor then addressed the inconsistencies in the victim's story that the defense had identified and stated, "I would suggest to you that her testimony was entirely credible given what she had gone through that night and that you should believe her."

[¶18]  At the close of trial, the court instructed the jury that "the opening statements and the closing arguments of the attorneys are not evidence." After deliberating for less than two hours, the jury returned a verdict finding Hassan guilty on the charges of aggravated assault, criminal threatening, and criminal restraint, and the court entered a finding of guilty on the charge of violation of condition of release.[4]  The court sentenced Hassan to ten years of imprisonment for the aggravated assault conviction; a consecutive four years of imprisonment, suspended, with two years of probation for the criminal threatening conviction; 364 days of imprisonment for the criminal restraint conviction, to run concurrently

---

[4]  Hassan waived his right to a jury trial on the charge that he violated a condition of release.

with his sentence for aggravated assault; and six months of imprisonment for violating the condition of release, also to run concurrently with the sentence for aggravated assault.

## II. DISCUSSION

[¶19] Hassan asserts three grounds for appeal: (A) the court erred by admitting evidence of the so-called "standoff" preceding Hassan's arrest; (B) the court erred by admitting the officer's testimony regarding how the police compiled the photographic array; and (C) he was denied a fair trial because of prosecutorial misconduct during the State's closing argument. We consider each contention in turn.

A.     Admission of Evidence Relating to the Police "Standoff"

[¶20] Hassan contends that the court erred in admitting testimonial evidence pertaining to the so-called "standoff"—that is, the events that transpired between when the police arrived at Riverside Park and when the occupants acceded to the police requests to exit the building. Specifically, Hassan argues that (1) the evidence was irrelevant because the State offered no evidence that Hassan knew that the police were there to arrest him for the assault of the victim; and (2) even if the evidence was relevant, it was unfairly prejudicial.

1. Relevance

[¶21] We review a trial court's ruling on evidentiary relevance for clear error. *Dolloff*, 2012 ME 130, ¶ 24, 58 A.3d 1032. Relevant evidence is evidence that tends to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R. Evid. 401. Evidence of events occurring after an alleged criminal act is generally relevant "if it tends to establish the defendant's state of mind." *State v. Hayes*, 675 A.2d 106, 109 (Me. 1996). Specifically, evidence of a defendant's effort to avoid arrest can demonstrate a consciousness of guilt, *see State v. Wright*, 662 A.2d 198, 201 (Me. 1995), which is relevant to a fact-finder's determination of guilt.

[¶22] Here, the testimonial and physical evidence that linked Hassan to the assault of the victim was substantial, and a fact-finder could reasonably infer from the victim's testimony that Hassan knew that the police were at the apartment to question and possibly arrest him for assaulting the victim several hours earlier. Accordingly, evidence of Hassan's failure to exit the apartment during the several hours in which the police were waiting outside was probative of his consciousness of guilt, *see id.*, and could aid the fact-finder in concluding that he had committed the crimes with which he was charged. As such, the evidence was relevant. *See* M.R. Evid. 401.

2.    Danger of Unfair Prejudice

[¶23]  Hassan next argues that the danger of unfair prejudice outweighed the probative value of admitting evidence of the events preceding his arrest and that the standoff evidence should have been excluded pursuant to M.R. Evid. 403.  We disagree for two reasons.

[¶24]  First, the court acted well within its discretion in denying the motion in limine and Hassan's general objection made prior to Officer Farris's testimony. Hassan did not make an offer of proof, introduce voir dire testimony, or otherwise identify the details of the standoff that he sought to exclude.  Because the weighing of the probative value of evidence against the danger of unfair prejudice required by M.R. Evid. 403 is fact-intensive, the court did not abuse its discretion in denying Hassan's motion and general objection.    *See State v. Patterson*, 651 A.2d 362, 367 (Me. 1994) (cautioning trial courts "to refrain from making Rule 403 determinations prior to trial"); Field & Murray, *Maine Evidence* § 403.1 at 109 (6th ed. 2007) (observing that in most cases a Rule 403 analysis "cannot be carried out except in the context of the actual trial and the other evidence that is presented.").

[¶25]  Second, because Hassan did not object to the evidence as it was elicited at trial, our review of his challenge to the evidence that was admitted as being excessive, unexpectedly inflammatory, or beyond what was anticipated

12

through the discussion of the motion in limine is limited to obvious error.[5] *See State v. Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147. Pursuant to that standard of review, Hassan is not entitled to a new trial unless the admission of the evidence resulted in a "manifest injustice." *See id.* (quotation marks omitted).

[¶26] A court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." M.R. Evid. 403.[6] "Prejudice, in this context, means more than simply damage to the opponent's cause. . . . [It] is an undue tendency to move the tribunal to decide on an improper basis . . . ." *State v. Brine*, 1998 ME 191, ¶ 9, 716 A.2d 208 (quotation marks omitted). Prejudicial evidence is inherently inflammatory evidence that is likely to arouse the passion of the fact-finder. *Compare State v. Thongsavanh*, 2004 ME 126, ¶ 3, 861 A.2d 39

---

[5] The dissent contends that Hassan's motion in limine seeking to keep out any evidence related to the *subject of the standoff* and his general renewal of that objection prior to Officer Farris's testimony were sufficient to preserve the issue for harmless error review. We agree. However, the dissenting opinion also treats the motion in limine and the renewed objection as having preserved for harmless error review the testimony concerning the *details of the standoff* although Hassan did not object to any of the prosecutor's questions, aside from one hearsay objection. Hassan's failure to object deprived the court of the opportunity to decide whether any of the details should have been excluded under a M.R. Evid. 403 analysis. *See State v. Dolloff*, 2012 ME 130, ¶ 39 n.11, 58 A.3d 1032; Field & Murray, *Maine Evidence* § 103.7 at 28–29 (6th ed. 2007) ("[T]he fact that the trial court has acted on a motion in limine does not relieve counsel of making objections and offers of proof at the appropriate points in the trial in order to make a record and preserve points of error for appeal."). Accordingly, obvious error analysis applies.

[6] Pursuant to Rule 403, a court may also exclude evidence if its probative value is outweighed by "confusion of the issues" or "needless presentation of cumulative evidence." M.R. Evid. 403. Hassan does not present either issue as a ground for appeal. We note, however, that the admission of the evidence of the events preceding Hassan's arrest, although detailed, does not constitute obvious error pursuant to these provisions of Rule 403. Considering the admitted evidence in the context of the trial as a whole, we find no sound basis to conclude that but for the admission of the evidence, there is a reasonable probability that the outcome of Hassan's trial would have been different. *See State v. Pabon*, 2011 ME 100, ¶¶ 29, 35, 28 A.3d 1147.

(concluding that evidence of a defendant's sacrilegious T-shirt was inflammatory), *with State v. Patton*, 2012 ME 101, ¶ 32, 50 A.3d 544 (concluding that evidence of condoms, lubricant, lingerie, and a sexually assaulted victim's age was not inflammatory), *and Hayes*, 675 A.2d at 109–10 (concluding that evidence of a defendant's association with narcotics was not inflammatory).

[¶27] The balance in this case favored the admission of the evidence. Details of the events preceding Hassan's arrest were probative of his guilty conscience, but were not inherently inflammatory or abhorrent such that they would create an undue risk that the jury would reach a verdict based on emotion or any other improper ground. We see no basis to conclude that the admission of evidence of the events preceding Hassan's arrest resulted in a "manifest injustice," and we thus find no obvious error. *See Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147.

B.    Photographic Array

[¶28] Hassan asserts that the police officer's testimony concerning the process by which the police assembled the photographic array constituted impermissible character evidence in violation of M.R. Evid. 404(b) because it suggested that he had an arrest record.

[¶29] We review for clear error a court's decision to admit evidence pursuant to Rule 404(b). *State v. Turner*, 2001 ME 44, ¶ 5, 766 A.2d 1025. Rule 404(b) prohibits the admission of evidence of past crimes "to prove the character

14

of a person in order to show that the person acted in conformity therewith." M.R. Evid. 404(b). However, character evidence is admissible if it is relevant, "more probative than prejudicial," and "offered for a purpose other than establishing character." *State v. Pierce*, 474 A.2d 182, 185 (Me. 1984).

[¶30] We have previously concluded that the admission of evidence of a photographic array containing a defendant's mug shot violated Rule 404(b) because it implied to the jury that the defendant had a prior criminal record, yet served no purpose within the context of the trial. *State v. Robbins*, 666 A.2d 85, 87–88 (Me. 1995). Hassan contends that although the jury did not see the photographic array in this case, the circumstances are similar to *Robbins* because the police officer's testimony—that the photographs used for the photographic array are "typically arrest photographs"—implied to the jury that Hassan's photograph came from a prior arrest. This contention, however, mischaracterizes the officer's testimony.

[¶31] The officer testified that although in some cases he used mug shots to assemble photographic arrays, in this case, he assembled the photographic array using photographs from a variety of sources, including mug shots, yearbook pictures, and DMV photographs. He did not testify as to the source of Hassan's photograph, nor did he imply that it was a mug shot. In addition, neither the photographic array nor Hassan's picture in the array was received in evidence or

shown to the jury. As such, the officer's testimony did not create the kind of prejudice we identified in *Robbins*. Further, the State elicited the officer's testimony to demonstrate the reliability of the procedures employed in this case and therefore offered the evidence for a purpose other than to establish Hassan's character. Thus, the court did not err in allowing the testimony. *See Turner*, 2001 ME 44, ¶ 5, 766 A.2d 1025; *Pierce*, 474 A.2d at 185.

C.     Prosecutorial Misconduct

[¶32]     Hassan argues that during closing argument, the prosecutor improperly vouched for the victim's credibility as a witness by arguing: "I would suggest to you that her testimony was entirely credible given what she had gone through that night and that you should believe her." Because Hassan did not preserve the issue by objecting to the prosecutor's closing argument, our review is for obvious error. *See* U.C.D.R.P.–Cumberland County 52(b); M.R. Crim. P. 52(b); M.R. Evid. 103(e); *Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.

[¶33] A lawyer shall not "state a personal opinion as to . . . the credibility of a witness." M.R. Prof. Conduct 3.4(e); *see also State v. Williams*, 2012 ME 63, ¶ 46, 52 A.3d 911 ("A prosecutor improperly vouches for a witness when she . . . impart[s] her personal belief in a witness's veracity or impl[ies] that the jury should credit the prosecution's evidence simply because the government can be trusted." (quoting *United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1st Cir. 2003))).

However, "an argument that does no more than assert reasons why a witness ought to be accepted as truthful by the jury is not improper witness vouching." *Perez-Ruiz*, 353 F.3d at 10 (quotation marks omitted). A prosecutor may "appeal to the jury's common sense and experience without crossing the line into prohibited argument." *State v. Schmidt*, 2008 ME 151, ¶ 17, 957 A.2d 80 (quotation marks omitted). "[T]he central question is whether the comment is fairly based on facts in evidence, or improperly reflects a personal belief" about the witness's overall credibility. *State v. Moontri*, 649 A.2d 315, 317 (Me. 1994).

[¶34] Here, the prosecutor suggested to the jury—by the use of the phrase "I would suggest"—that the victim was credible and should be believed. Specifically, the prosecutor explained that although the defense identified inconsistencies in the victim's story, these inconsistencies did not bear on the victim's credibility because misstatements by the victim during the morning of her attack were understandable "given what [the victim] had gone through that night." The prosecutor's "suggestion" was, in effect, an appeal to the jury's common sense, based on facts in evidence, as to why the jury ought to find the victim credible. Viewed in context, the prosecutor's statement was not witness-vouching nor otherwise improper. *See Perez-Ruiz*, 353 F.3d at 10; *Schmidt*, 2008 ME 151, ¶ 17, 957 A.2d 80; *Moontri*, 649 A.2d at 317. The court's failure to strike the

prosecutor's statement does not constitute obvious error. *See Pabon*, 2011 ME 100, ¶ 19, 28 A.3d 1147.

The entry is:

Judgment affirmed.

---

JABAR, J., *dissenting.*

[¶35] I respectfully dissent because, while each of the trial court's errors may not by itself have affected Hassan's "substantial rights," *see* U.C.D.R.P.– Cumberland County 52(a); M.R. Crim. P. 52(a), when considered together, the errors deprived Hassan of a fair trial.

[¶36] The three errors alleged by Hassan are all connected to issues of Hassan's reputation and credibility. First, over Hassan's objection, the court allowed testimony by police officers regarding prejudicial details of his arrest, including particulars of a standoff with police, the police's familiarity with Hassan, and the possible presence of a firearm in the barricaded apartment. Second, the court allowed testimony by a police officer concerning the photographic array presented to the victim, suggesting that Hassan was involved in past criminal conduct. Third, and without objection, the prosecutor committed misconduct by personally vouching for the credibility of the victim: that misconduct went unaddressed by the court.

18

A.     The Cumulative Error Doctrine

[¶37]  The general rule is that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).  However, there are serious errors that can rise to a level requiring an appellate court to vacate a conviction and order a new trial.  *See id.* at 681-82.  Referred to as the "cumulative error doctrine," federal courts recognize that sometimes "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect" on a defendant's right to a fair trial.  *United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993); *see also United States v. Brown*, 669 F.3d 10, 21 (1st Cir. 2012); *United States v. Caro*, 597 F.3d 608, 635 (4th Cir. 2010); *United States v. Baker*, 432 F.3d 1189, 1223-24 (11th Cir. 2005); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990).

[¶38]  The United States Court of Appeals for the First Circuit explained the test for assessing the effect of cumulative errors as follows:

> Of necessity, claims under the cumulative error doctrine are *sui generis*.  A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case.  The run of the trial may also be

important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*Sepulveda*, 15 F.3d at 1196 (citation omitted). The analysis "focuses on 'the underlying fairness of the trial.'" *United States v. Meserve*, 271 F.3d 314, 332 (1st Cir. 2001) (quoting *Van Arsdall*, 475 U.S. at 681).

[¶39] Although we have not explicitly adopted the federal cumulative error analysis, we have recognized that individual errors, when taken together, can deprive a defendant of a fair trial. *See, e.g.*, *State v. Dolloff*, 2012 ME 130, ¶ 74, 58 A.3d 1032 (reviewing multiple allegations of prosecutorial misconduct, some of which resulted in error, "cumulatively and in context to determine whether [the defendant] received an unfair trial that deprived her of due process"); *State v. Linnell*, 408 A.2d 693, 694-95 (Me. 1979) (vacating a judgment of conviction because of "[t]he cumulative effect" of an evidentiary error, improper interrogation of a witness by the trial court, and an inappropriate comment by the trial court on an issue of fact when instructing the jury).

B.   Application of the Cumulative Error Doctrine

   1.   Claims of Error Analyzed Individually

      a.   Police Standoff

[¶40] We review a trial court's ruling on evidentiary relevance for clear error, *see Dolloff*, 2012 ME 130, ¶ 24, 58 A.3d 1032, and its decision to admit

evidence pursuant to M.R. Evid. 403 for abuse of discretion, *see State v. Patton*, 2012 ME 101, ¶ 24, 50 A.3d. 544.  Although the Court concludes that our review is constrained to an obvious error analysis because Hassan failed to preserve the issue by challenging the testimony surrounding the standoff, *see* Court's Opinion ¶ 25,[7] whether it is reviewed for harmless error or obvious error has no effect on the final outcome of the cumulative error analysis.

[¶41]  Relevant evidence may be excluded if a court determines that "its probative value is substantially outweighed by the danger of unfair prejudice." M.R. Evid. 403.  "Unfairly prejudicial evidence is evidence that has an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one."  *Patton*, 2012 ME 101, ¶ 25, 50 A.3d. 544 (quotation marks omitted).  The "critical factor" in determining whether evidence unfairly prejudices a defendant "is the significance of the [evidence] in proving the

---

[7]  The record demonstrates that Hassan did, in fact, challenge the testimony at issue, first through a pre-trial motion in limine, and second by renewing his objection at an appropriate point in the trial prior to the testimony of Officer Farris.  *See State v. Dolloff*, 2012 ME 130, ¶ 39 n.11, 58 A.3d 1032 (explaining that "[t]he requirement is to object at a time when the court retains the ability to provide a meaningful corrective instruction," which may require counsel to "wait a short time in order not to 'throw the skunk into the jury box.'").

"An issue is deemed to be raised or preserved if there is a sufficient basis in the record to alert the trial court . . . and any opposing party to the existence of that issue," Alexander, *Maine Appellate Practice* § 402(a) at 243 (4th ed. 2013) (quotation marks omitted), and "a motion in limine may preserve a Rule 403 objection to the admission of evidence when the court's ruling on the motion is unequivocally final." *State v. Allen*, 2006 ME 21, ¶ 9 n.3, 892 A.2d 456 (quotation marks omitted).  Here, the court's ruling on the motion in limine and Hassan's renewal of the objection at trial was unequivocally final. Although it is conceivable that Hassan could have renewed his objection at an earlier time during the "tangential testimony" of Officer Morin, Hassan still properly preserved the issue for appellate review.

State's case." *State v. Conner*, 434 A.2d 509, 512 (Me. 1981). We have noted that "[w]here the [evidence] has minimal significance, e.g., where it is probative only of uncontroverted facts, or where its value is merely cumulative of other less prejudicial evidence, then it is the responsibility of both the prosecutor and the trial court to examine closely th[e] [evidence] that [is] arguably prejudicial." *Id.*; *see also State v. Bickart*, 2009 ME 7, ¶ 39, 963 A.2d 183 ("Appropriate to this balancing [required by Rule 403] is consideration of . . . the availability of other and less prejudicial means of proof . . . ." (quotation marks omitted)).

[¶42] The prosecutor referenced the police standoff in her opening statement, telling the jury that they "may . . . have heard about [the standoff]," lasting for "several hours," "when it happened." In questioning Officer Farris, the prosecutor asked the officer whether the standoff was "like TV" where police have "weapons trained on" the apartment, to which Farris replied, "At times we did." Testimony of the police standoff included mention of (1) a SWAT team and a "Special Reaction Team" with a crises hostage negotiator, (2) an armored personnel carrier, (3) ballistic helmets and "very, very heavy vests to stop rifle penetration" worn by police, (4) "victims or hostages" possibly located in the apartment, and (5) concern that Hassan might have been holding a firearm while speaking with Farris. Farris testified that he was familiar with Hassan, had his cell phone number, and called Hassan by his street name, "BK," during negotiations.

22

[¶43]  This evidence strongly suggested that Hassan was a very dangerous person and that extreme measures had to be taken by police to secure his arrest.  I agree with the Court's opinion that Hassan's refusal to exit the building surrounded by police may be relevant insofar as it is probative of his consciousness of guilt. Court's Opinion ¶¶ 21-22; *see State v. Hayes*, 675 A.2d 106, 108-10 (Me. 1996). However, the evidence of police action during the standoff, police familiarity with Hassan's street name, and the officers' concern that Hassan might have a firearm were both unnecessary and unfairly prejudicial.  *See* M.R. Evid. 403; *Patton*, 2012 ME 101, ¶ 25, 50 A.3d. 544; *United States v. Williams*, 739 F.2d 297, 299-301 (7th Cir. 1984) (determining that testimony by a police detective "that he knew the defendant as 'Fast Eddie'" unfairly prejudiced the defendant and required a new trial because, among other things, the evidence "was completely unrelated to any of the other proof against the defendant" and the "prosecution's only possible purpose in eliciting the testimony was to create an impression in the minds of the jurors that the defendant was known by the police to be an unsavory character or even a criminal").

[¶44]  Extensive testimony concerning the circumstance of Hassan's arrest constituted "propensity evidence" that generalizes "a defendant's [other] bad act[s] into bad character and tak[es] that as raising the odds that he did the . . . bad act

now charged." *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997) (quotation marks omitted).

[¶45] The court could have allowed the admission of evidence of his refusal to submit to arrest and the seven-hour standoff while still preventing unfair prejudice. *See* M.R. Evid. 403; *Old Chief*, 519 U.S. at 184 ("[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives."); *cf. United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000) (holding that, pursuant to Rule 403, the "risk of an improper criminal propensity inference should be considered in light of the totality of the circumstances, *including the government's need for the evidence given other available testimony*" (emphasis added)). Moreover, the Rule 403 "balancing act" involves consideration of the availability of other, less prejudicial, means of proof. *See Bickart*, 2009 ME 7, ¶ 39, 963 A.2d 183; *Conner*, 434 A.2d at 512. Hassan's refusal to surrender could have been established without reference to the highly prejudicial details of the standoff.

[¶46] Therefore, the trial court abused its discretion by allowing extensive, unfairly prejudicial testimony concerning the police standoff. *See* M.R. Evid. 403; *Old Chief*, 519 U.S. at 180-84; *Varoudakis*, 233 F.3d at 122; *Bickart*, 2009 ME 7, ¶ 39, 963 A.2d 183; *State v. Lipham*, 2006 ME 137, ¶ 9, 910 A.2d 388; *Conner*, 434 A.2d at 512. Because the cumulative effect of the errors denied Hassan a fair

trial, it is unnecessary to determine, under either the harmless error or obvious error analysis, whether this error, standing alone, affected Hassan's substantial rights. *See* U.C.D.R.P.–Cumberland County 52; M.R. Crim. P. 52.

b.     Photographic Array

[¶47]  Generally, a trial court's decision to admit evidence under Maine Rule of Evidence 404(b) is reviewed for clear error, and a decision under Rule 403 is reviewed for abuse of discretion. *State v. Turner*, 2001 ME 44, ¶ 5, 766 A.2d 1025. Here, Hassan's motion in limine argued, among other things, that evidence of the photographic array should be excluded because the State intended "to introduce testimony from Detective Dunham that the photo line-up shown to [the victim] exclusively contained photographs of men who the police believe are associated with criminal activity." In its pretrial ruling on Hassan's motion, the court explained that the State had "no intention" of eliciting testimony "about the fact that the people in the photo lineups are people who have been arrested in the past." Instead, according to the court's understanding, the prosecutor was "going to simply get into the photograph lineup process with the witness with *no reference as to where the photographs came from or anything of that nature*." (Emphasis added.)

[¶48]   Despite the court's understanding that the State would only tangentially introduce evidence regarding the photographic array, Dunham testified

extensively as to the manner in which police assembled photographic arrays. Explaining the past and current methods used by police, he stated that arrays are "typically" composed of "arrest photographs," strongly suggesting that Hassan was among a group of persons involved in past criminal conduct. This testimony was irrelevant, prejudicial, and served only to establish that Hassan had a criminal character and "acted in conformity" with that character on the night the victim was assaulted. *See* M.R. Evid. 404(b); *State v. Pierce*, 474 A.2d 182, 185 (Me. 1984). Exacerbating the prejudicial effect of this testimony, Farris testified that he was "familiar" with Hassan, had Hassan's cell phone number, and identified Hassan by his street name, "BK."

[¶49] Maine Rule of Evidence 404(b) prohibits admission of evidence of past crimes "to prove the character of a person in order to show that the person acted in conformity therewith." However, such evidence is admissible if it is relevant, "more probative than prejudicial," and "offered for a purpose other than establishing character." *Pierce*, 474 A.2d at 185; *see also Turner*, 2001 ME 44, ¶ 5, 766 A.2d 1025.

[¶50] The court erred in allowing Dunham's testimony concerning the manner in which police assembled the photographic array used to identify Hassan. Because the cumulative effect of the errors denied Hassan a fair trial, it is unnecessary to determine under the obvious error analysis whether this error,

standing alone, affected Hassan's substantial rights. *See* U.C.D.R.P.–Cumberland County 52(b); M.R. Crim. P. 52(b).

### c. Prosecutorial Misconduct

[¶51]  A lawyer may not "state a personal opinion as to . . . the credibility of a witness."  M.R. Prof. Conduct 3.4(e); *see also State v. Williams*, 2012 ME 63, ¶ 46, 52 A.3d 911.  "A prosecutor improperly vouches for a witness . . . [by] impart[ing] her personal belief in a witness's veracity or imply[ing] that the jury should credit the prosecution's evidence simply because the government can be trusted."  *Id.* (quoting *United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1st Cir. 2003)).  As the Court notes, because Hassan failed to object to the instances of prosecutorial misconduct at trial, our review is for obvious error.  Court's Opinion ¶ 32; *see Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.

[¶52]  The prosecutor engaged in misconduct when she interjected her personal opinion about the victim's credibility into her closing argument.  The Court cites as the only instance of prosecutorial misconduct, not objected to by the defendant at trial, the prosecutor's statement during closing arguments, "I would suggest to you that [the victim's] testimony was entirely credible given what she had gone through that night and that you should believe her."  However, the prosecutor also clearly interjected her own opinion when she said that the victim "was pretty forthright and honest, *I think you would agree with me*."  (Emphasis

added); s*ee* M.R. Prof. Conduct 3.4(e); *see also Dolloff*, 2012 ME 130, ¶ 56, 58 A.3d 1032 (concluding that the prosecutor committed misconduct during closing argument by repeatedly using the phrase, "I think," which "could have been understood by the jury to present the prosecutor's personal opinion" (quotation marks omitted)). Clearly, interjecting her personal opinion by encouraging the jury to agree with her assessment of credibility was a serious instance of prosecutorial misconduct—a violation of M.R. Prof. Conduct 3.4(e) that is far more egregious than use of the phrase "I suggest."

[¶53] The context in which the prosecutor's statements took place is also important. *See State v. Dolloff*, 2012 ME 130, ¶ 44, 58 A.3d 1032 (requiring trial and appellate courts to consider the "overall context of the trial" when assessing allegations of prosecutorial misconduct). In this case, only the victim's testimony identified Hassan as the individual who assaulted her with a knife and then held her captive. During Hassan's opening statement, the cross-examination of the victim, and Hassan's closing argument, defense counsel framed the case as resting entirely on the credibility of the victim.

[¶54] Thus, the prosecutor's improper vouching for the victim, considered in the context of a trial focused on the credibility of the victim and tainted by errors that undermined Hassan's character, constituted prosecutorial misconduct that was not adequately addressed by the court. Because the cumulative effect of the errors

denied Hassan a fair trial, it is unnecessary to determine under the obvious error analysis whether this error affected Hassan's substantial rights. *See* U.C.D.R.P.–Cumberland County 52(b); M.R. Crim. P. 52(b).

2. Errors Analyzed Cumulatively

[¶55] To vacate a judgment of conviction based on cumulative error, an appellate court must conclude that:

(1) Errors occurred;

(2) Those errors, analyzed individually, were either harmless or did not result in manifest injustice; and

(3) Considered together, those errors resulted in the defendant receiving an unfair trial.

*See* U.C.D.R.P.–Cumberland County 52; M.R. Crim. P. 52; *United States v. Bayard*, 642 F.3d 59, 66 (1st Cir. 2011) (applying the cumulative error doctrine and noting that "without *any* errors, there is nothing to accumulate"); *Meserve*, 271 F.3d at 332 (describing the cumulative error doctrine).

[¶56] Although individually the errors may not have deprived Hassan of a fair trial, when viewed together their cumulative effect is far more disconcerting. First, all of the errors were interrelated, concerning issues of credibility and the character of both the victim and Hassan. *See Sepulveda*, 15 F.3d at 1196. During the State's closing argument, the prosecutor personally vouched for the credibility

of the victim. In a case that largely hinged on the credibility of the victim and Hassan, the prosecutor's vouching is significant and highly prejudicial.

[¶57] Moreover, the court admitted substantial evidence offered by the State supporting the inference that Hassan was a dangerous person with a criminal history. The evidence surrounding the photographic array suggested that Hassan had been involved in prior criminal conduct, while the evidence surrounding the police standoff suggested that he was dangerous and unstable.

[¶58] This evidence significantly impacted the jury's perception of Hassan's character. Because of the danger associated with this type of propensity evidence, the admission of other prior bad acts or criminal history in a criminal trial is inherently prejudicial. *See State v. DeMass*, 2000 ME 4, ¶ 12, 743 A.2d 233 (emphasizing that evidence of other crimes or bad acts "may be admitted *only if it is relevant* to some . . . issue [other than acting in conformity with the behavior] at trial." (quotation marks and alterations omitted)); Field & Murray, *Maine Evidence* § 404.4 at 141 (6th ed. 2007) (explaining that Rule 404(b) seeks to prevent jurors from adopting the "hypothesis that a person who has committed one or more other crimes is more likely than not to have committed another [crime]").

[¶59] Second, the court did not take sufficient remedial steps to negate the prejudicial effect of the errors. *See Sepulveda*, 15 F.3d at 1196. Although the court did instruct the jury that the "closing arguments of the attorneys are not

evidence," this instruction failed to adequately address the cumulative effect of the errors, which together portrayed Hassan as a dangerous criminal. *Cf. State v. Mooney*, 2012 ME 69, ¶¶ 18 n.6, 19, 43 A.3d 972.

[¶60]  Third, this was a short, one-day trial, where errors "may often pack a greater punch . . . than in a much longer trial." *See Sepulveda*, 15 F.3d at 1196. Here, the erroneously allowed evidence and argument were a significant portion of the overall testimony and argument offered against Hassan.

[¶61]  Finally, only the victim's testimony and out-of-court identification linked Hassan to the charges of assault, criminal threatening, and criminal restraint. *See id.* (explaining that courts applying the cumulative error doctrine should consider "the strength of the government's case").  Further, the victim was inconsistent in her explanation as to who assaulted her.  She initially told a convenience store cashier that she was assaulted by two girls who stole her cell phone, later told investigators that she was assaulted by someone named "Omar," then, on cross-examination, denied giving investigators the name "Omar."

[¶62]  Given these weaknesses in the State's case, the short duration of the trial, the interrelationship of the errors, and the overall prejudicial effect of the errors on credibility, the risk of jurors being influenced by the improper evidence and argument is directly related to the outcome of the trial.  These errors, when considered together and applying the cumulative error doctrine, deprived Hassan of

a fair trial.  I would vacate the judgment of conviction and remand the case to the trial court for a new trial.

---

**On the briefs:**

> Verne E. Paradie, Jr., Esq., Trafton & Matzen, LLP, Auburn, for appellant Samadi Hassan
>
> Stephanie Anderson, District Attorney, and Deborah A. Chmielewski, Asst. Dist. Atty., Office of District Attorney, Prosecutorial District No. Two, Portland, for appellee State of Maine

**At oral argument:**

> Verne E. Paradie, Jr., Esq., for appellant Samadi Hassan
>
> Deborah A. Chmielewski, Asst. Dist. Atty., for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2011-4230
FOR CLERK REFERENCE ONLY