MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2019 ME 170
Docket:      Cum-19-5
Argued:      October 8, 2019
Decided:     December 23, 2019

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

BRANDON J. COLEMAN

HJELM, J.

[¶1]  On a summer evening in 2017, a seven-week-old child, while alone with her father at their residence, lost consciousness and was rushed to the hospital.  The infant's treating physicians determined that she had suffered subdural hematomas, retinal hemorrhages, and external bruising—a constellation of injuries caused, in this case, by traumatic child abuse.  The child's father, Brandon J. Coleman, was charged with two counts of aggravated assault and one count of assaulting a child younger than six years old.

[¶2]  Coleman proceeded to trial (Cumberland County, *Cashman, J.*), where a jury found him guilty of all charges.  Coleman appeals from the judgment of conviction ultimately entered by the court, asserting that the State engaged in prosecutorial misconduct during the trial, that the court's

2

instructions to the jury on the elements of the aggravated assault charges were erroneous, and that the evidence was insufficient to support the conviction for one of the aggravated assault charges. We affirm the judgment.

## I. BACKGROUND

[¶3] We draw the following account of the case from the procedural record and from the evidence as viewed in the light most favorable to the State. *See State v. Adams*, 2019 ME 132, ¶ 2, 214 A.3d 496.

[¶4] In July of 2017, Coleman and his girlfriend lived in an apartment in Portland with their infant daughter. In the weeks after the child's birth, she had no known health problems. During the evening hours of July 1, 2017, the child's mother was at work, and Coleman was caring for the child by himself. Earlier that day when the mother was caring for the child, the child was experiencing no sign of distress and was, according to her mother, "her normal self." Coleman later reported to the child's treating physicians and an investigator that over the course of the evening, the child began to cry and then "went limp in his arms as if she had died." Coleman eventually called 9-1-1. Medical first responders brought the child to the hospital, where she was found to have subdural hematomas, retinal hemorrhages, and external bruising.

[¶5]  Several months later, in September of 2017, Coleman was indicted for one count of Class A aggravated assault, 17-A M.R.S. § 208(1)(A-1) (2018),[1] one count of Class B aggravated assault, 17-A M.R.S. § 208(1)(A) (2018),[2] and one count of Class C assault on a person younger than six years of age, 17-A M.R.S. § 207(1)(B) (2018).[3]  He pleaded not guilty to all charges.

[¶6]  In November of 2018, the court conducted a four-day jury trial.  In support of the allegation that the child's injuries resulted from abuse inflicted by Coleman, the State presented the testimony of Dr. Lawrence Ricci, a board-certified child-abuse pediatrician.  Dr. Ricci concluded that, given the nature and extent of the child's injuries and the absence of evidence that she was injured accidentally, the child had sustained abusive head trauma—a formal medical diagnosis, which he stated was "clear-cut" in this case.  Dr. Ricci explained that the injury resulted from acceleration/deceleration of the child's

---

[1]  Section 208(1)(A-1) provides, "A person is guilty of aggravated assault if that person intentionally, knowingly or recklessly causes . . . [b]odily injury to another that causes serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ."  17-A M.R.S. § 208(1)(A-1) (2018).

[2] Section 208(1)(A) provides, "A person is guilty of aggravated assault if that person intentionally, knowingly or recklessly causes[] [b]odily injury to another that creates a substantial risk of death or extended convalescence necessary for recovery of physical health."  17-A M.R.S. § 208(1)(A) (2018).

[3] Section 207(1)(B) provides, "A person is guilty of assault if . . . [t]he person has attained at least 18 years of age and intentionally, knowingly or recklessly causes bodily injury to another person who is less than 6 years of age."  17-A M.R.S. § 207(1)(B) (2018).

4

head due to shaking or blunt trauma or both. The State also offered testimony from the child's neurologist and radiologist that the injuries were caused by trauma and were not attributable to natural causes. The neurologist concluded that, due to the child's extensive injuries, she would continue to suffer severe neurological delays and faced the possibility of cerebral palsy, epilepsy, intellectual disabilities, and impaired verbal communication and vision.

[¶7] Coleman contended that the child was not assaulted but rather that her condition resulted from a nontraumatic medical emergency. To support that theory, Coleman presented testimony from Dr. Joseph Scheller, a board-certified pediatric neurologist, who told the jury that the child had suffered a venous stroke and was not the victim of trauma. Dr. Scheller stated that the child possibly had thrombophilia, a potentially deadly vascular condition that causes an abnormal amount of clotting. The following exchange occurred during the State's cross-examination of Dr. Scheller:

Q. Now, at what point, Dr. Scheller, did you reach out to any one of these doctors and say [the child] potentially has this life-threatening disease?

A. I haven't done it.

Q. Is it not your obligation as a doctor if you believe a child has a deadly disease that has gone undiagnosed to reach out and to alert them to that?

A.  Well, I did so in the letter.  I don't know who the letter was shared with and I'm not her treating physician, I'm a physician who is consulted by her lawyer so I am playing a completely different role.

. . . .

Q.  And you've taken a medical ethics class, have you, sir?

A.  Sure.

[¶8]  At this point, Coleman objected, stating, "I think he talked about his role in this case as being a consultant, not a treater and I don't think we're talking about rules of ethics here, I think we are going too far afield."  The court overruled the objection, and the State continued its cross-examination:

Q.  So I asked you about your medical ethics class.  You took that, that's a standard class you take in medical school, right?

A.  Yes.  Yes, ma'am.

Q.  And as part of that class and as part of all of your education to become a doctor let alone a pediatrician if you see a child that you believe has an undiagnosed potentially life-threatening disorder are you not medically obligated to tell her doctors?

A.  Correct.

Q.  You are not medically obligated to do that?

A.  The way I understand my course, yes, ma'am.  I have seen 100 children in my children's schools that have asthma and I don't walk over to them and say, you know, you have a potentially life-threatening condition, has your pediatrician explained that to you.  Oh, using an inhaler, okay, good luck in your soccer game.

6

[¶9]   In its closing argument, the prosecutor drew on that part of Dr. Scheller's testimony and, without objection, told the jury,

> Now, I suggest to you that Dr. Scheller may have some doubts about that theory that [the child] does in fact have this clotting disorder because if he really believes that [the child] did, if he really believes that [the child] has this disorder that could strike at any time and he didn't pick up that phone and he didn't reach out to those doctors is his testimony worth your trust?   Are his conclusions worth your trust as jurors?

[¶10]  After the parties' summations, the court instructed the jury both orally and in writing on the elements of the three charges.  The court gave the following instruction on the elements of aggravated assault as charged in count 1, which alleged a violation of section 208(1)(A-1):

> With respect to the first charge under the law in Maine a person is guilty of aggravated assault as charged in Count 1 if he intentionally or knowingly or recklessly causes serious bodily injury to a family or household member who is less than six years of age where the bodily injury caused serious permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ.
>
> . . . .
>
> . . . In the context of Count 1 serious bodily injury is defined in our law as physical pain or physical illness or any impairment of physical condition that causes serious permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ.

[¶11]  The court's instructions on count 2, which alleged a violation of section 208(1)(A), included the following:

> Under the law in Maine a person is guilty of aggravated assault as charged in Count 2 if he intentionally or knowingly or recklessly causes serious bodily injury to a family or household member who's less than six year[s] of age that created a substantial risk of death or extended convalescence necessary for recovery of physical health.
>
> . . . .
>
> Now, in the context of Count 2 the definition of serious bodily injury is defined in our law as physical pain or physical illness or any impairment of physical condition which creates a substantial risk of death or extended convalescence necessary for recovery of physical health.

Neither party objected to the court's instructions.

[¶12]  The jury found Coleman guilty of all three charges.  After holding a sentencing hearing a month later, on the charge of Class A aggravated assault the court imposed a twenty-year prison term with six years suspended and six years of probation, and the court imposed concurrent sentences on the other two charges.  Coleman filed a timely appeal from the resulting judgment of conviction.  *See* 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

[¶13]  We address Coleman's appellate contentions seriatim.

8

A.    Prosecutorial Misconduct

[¶14]  Coleman first asserts that the prosecutor engaged in misconduct by implying, during cross-examination and her closing argument to the jury, that Dr. Scheller was unethical because he did not notify the child's doctors of his opinion that the child might have a potentially life-threatening congenital medical condition that had resulted in her medical crisis.[4]

[¶15]  Coleman's assertion implicates several different standards of appellate review.  He did not make any objection to the first part of the State's cross-examination of Dr. Scheller at issue, meaning that our review of that part of his challenge is for obvious error.  *See* M.R.U. Crim. P. 52(b); *see also State v. Dolloff*, 2012 ME 130, ¶¶ 35, 53, 58 A.3d 1032 (explaining and applying the

---

[4] Coleman also asserts that the State engaged in prosecutorial misconduct by eliciting testimony from Dr. Scheller—and then arguing the points in its summation to the jury—that he had worked on cases involving the Innocence Project, an organization that seeks to overturn convictions that it contends are wrongful, and by asking Dr. Scheller about the amount he was to be compensated for his work in this case.  Coleman did not object to any of this, but none of it constitutes error, much less obvious error.  *See* M.R. Evid. 611(b) ("Cross-examination may address matters relevant to any issue in the case, including the credibility of any witness."); *see also Werner v. Lane*, 393 A.2d 1329, 1338 (Me. 1978) (determining that payment arrangements between a party and an expert witness "is legitimate subject matter for comment to the jury" and "is admissible for whatever effect it may have on [the expert witness's] credibility"); *State v. Brown*, 321 A.2d 478, 482 (Me. 1974) ("Great latitude is allowed on cross-examination to show the special interests of an individual in testifying."); *cf. State v. Haji-Hassan*, 2018 ME 42, ¶ 22, 182 A.3d 145 (concluding that the court did not commit obvious error by excluding evidence of a state medical examiner's removal from a previous job "because the low probative value of the removal evidence was substantially outweighed by the dangers described in [evidentiary] Rule 403").  Further, because there was no impropriety or error regarding these aspects of the State's cross-examination and summation, Coleman's assertion of cumulative prejudice also fails.

obvious error standard of review to unpreserved claims of prosecutorial misconduct). Then, when Coleman did object, it was in the nature of a relevance objection because he stated only that Dr. Scheller was "a consultant, not a treater" and that the State's inquiry about ethical considerations went "too far afield." For purposes of our analysis, we assume—without deciding—that the relevance objection was sufficient to preserve the claim of prosecutorial misconduct he presses on appeal, thus resulting in our review for an abuse of discretion. *See State v. Mannion,* 637 A.2d 452, 455 (Me. 1994) (stating that rulings regarding the scope of cross-examination are reviewed for an abuse of discretion); M.R. Evid. 611. Finally, Coleman did not object to any aspect of the State's summation, so we review that part of his appellate challenge for obvious error. *See Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.

[¶16] In discussing the parameters of proper prosecutorial advocacy at trial, we have stated that "a prosecutor may use wit, satire, invective and imaginative illustration in arguing the State's case and may present an analysis of the evidence in summation with vigor and zeal." *Id.* ¶ 41 (quotation marks omitted). "A prosecutor may properly suggest to the jury ways to analyze the credibility of witnesses when those arguments are fairly based on the facts in evidence." *State v. Hanscom*, 2016 ME 184, ¶ 20, 152 A.3d 632 (quotation marks

omitted); *see State v. Lockhart,* 2003 ME 108, ¶ 48, 830 A.2d 433 ("[A]lthough permitted to strike hard blows, [a prosecutor] may not strike foul ones." (quotation marks omitted)).

[¶17]  Here, the State's cross-examination of Dr. Scheller and the related portion of the State's closing argument did not constitute misconduct that required the court to sustain his limited objection or, where Coleman did not object at all, warrant judicial intervention sua sponte.

[¶18]  Coleman's argument to us is based on a misapprehension of the State's point at trial.  As the State explicitly explained to the jury in its summation, the purpose of the State's inquiry and argument about whether Dr. Scheller should have notified the child's medical providers about his opinion was to call into question whether Dr. Scheller actually believed that the child's medical crisis was caused by an underlying medical condition rather than by an assault.  *See State v. Hassan*, 2013 ME 98, ¶ 34, 82 A.3d 86.  Thus, contrary to Coleman's assertion on appeal, the State's argument was not built on an acceptance of Dr. Scheller's opinion, followed by an assertion that Dr. Scheller is unethical because he did not report that opinion to the child's medical providers.  Instead, the State challenged whether Dr. Scheller in fact held that opinion in the first place.

[¶19]  Further, the State's argument was grounded in the record.  When the prosecutor asked Dr. Scheller—without objection—whether he had alerted any of the child's treating physicians of his opinion that the child had a dangerous medical condition, Dr. Scheller's very first response was, "Well, I did so in the letter [setting out his opinion].  I don't know who[m] the letter was shared with . . . ."  This testimony introduced into the record is at least an implicit recognition by Dr. Scheller of some responsibility to convey his opinion to the child's providers.  On the basis of Dr. Scheller's own testimony, the State was entitled to argue to the jury that the letter was not an effective notification,[5] which in turn was a sufficient basis for the State to challenge the sincerity with which Dr. Scheller held that opinion.

[¶20]  On this record, neither the State's cross-examination nor its argument was improper.  *See State v. Schmidt*, 2008 ME 151, ¶ 17, 957 A.2d 80 ("The prosecutor is . . . permitted to appeal to the jury's common sense and experience without crossing the line into prohibited argument." (quotation marks omitted)).  The court did not abuse its discretion or otherwise commit

---

[5]  It bears note that, in its summation to the jury, the State did not suggest that there was a specific provision in the ethical canons that affirmatively required Dr. Scheller to notify the child's providers about his opinion.  Such a suggestion would have misstated the evidence presented at trial.

12

error because, viewed in context, there was no underlying prosecutorial misconduct.

B.    Jury Instructions

[¶21]  Coleman next asserts that the court's instructions on the injury elements contained in both counts of aggravated assault were erroneous because of the way the court explained the embedded definition of "bodily injury."

[¶22]  Because Coleman did not object to the jury instructions, we review the instructions for obvious error. *See Dolloff,* 2012 ME 130, ¶ 35, 58 A.3d 1032; M.R.U. Crim. P. 52(b).  Obvious error is present in jury instructions where there is "(1) error, (2) that is plain, and (3) that affects substantial rights."  *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147.  "If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings."  *Id.*; *see Dolloff*, 2012 ME 130, ¶ 36, 58 A.3d 1032 ("An error is plain if the error is so clear under current law that the trial judge and prosecutor were derelict in countenancing it . . . ."  (alteration omitted) (citation omitted) (quotation marks omitted)).  "[W]e review jury instructions in their entirety to determine whether they presented the relevant

issues to the jury fairly, accurately, and adequately, and we will vacate the court's judgment only if the erroneous instruction resulted in prejudice." *State v. Hansley*, 2019 ME 35, ¶ 8, 203 A.3d 827 (quotation marks omitted); *see also, e.g.*, *State v. Weaver*, 2016 ME 12, ¶ 11, 130 A.3d 972.

[¶23]  Sections 208(1)(A) and 208(1)(A-1) both define the nature of the injury that is an element of those crimes of aggravated assault.  *See* 17-A M.R.S. § 208(1)(A)-(A-1).  The injury elements in the statutes differ, but in each statute the qualifying injuries start with "bodily injury."  For aggravated assault as defined in section 208(1)(A), the requisite injury is a "[b]odily injury . . . that creates a substantial risk of death or extended convalescence necessary for recovery of physical health."  As for section 208(1)(A-1), the injury must be a "[b]odily injury . . . that causes serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ."  These aspects of the two injury elements are drawn from the statutory definition of "serious bodily injury,"[6] but neither of the two definitions of aggravated assault

---

[6]  "Serious bodily injury" is defined to be "a bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ, or extended convalescence necessary for recovery of physical health." 17-A M.R.S. § 2(23) (2018).  As we explain in the text, of these types of injuries, some are integrated into the definition of aggravated assault found in section 208(1)(A), and the rest are contained in the definition of aggravated assault found in section 208(1)(A-1).  In its instructions, the court told the jury that the State was required to prove "serious bodily injury."  This statement was incorrect because the State was required to prove only a certain type of "bodily injury" for each charge.  The *substance* of the pertinent instruction, however, correctly described the nature of the injury that

relevant to this case includes the entirety of "serious bodily injury" as the Legislature has defined it.[7]

[¶24] "Bodily injury" is statutorily defined as "physical pain, physical illness or any impairment of physical condition." 17-A M.R.S. § 2(5) (2018). As part of its instructions describing the elements of aggravated assault as defined in section 208(1)(A-1), the court told the jury that the State was required to prove, among other things, "serious bodily injury . . . where the bodily injury caused serious permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ." The court then went on to explain certain terms included in its overarching definition. As part of that elaboration, the court stated, "[S]erious bodily injury is defined in our law as *physical pain or physical illness or any impairment of physical condition* that causes serious permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ." (Emphasis added.) In other words, where

---

constituted an element of each charge. There was certainly no obvious error in the court's mere references to "serious bodily injury" because the court did not provide the jury with a full definition of that term. And, in any event, if either party was prejudiced by the court's phraseology, it would have been the State because any misimpression would have expanded the elements, thereby making each charge more difficult to prove.

7 In other statutes, the Legislature has included "serious bodily injury" in its entirety as an element. *See, e.g.*, 17-A M.R.S. § 208-B(1)(A) (2018) (elevated aggravated assault); 17-A M.R.S. § 211(1) (2018) (reckless conduct); 17-A M.R.S. § 301(1)(B)(1) (2018) (kidnapping); 17-A M.R.S. § 554(1)(B-2)(1) (2018) (endangering the welfare of a child).

section 208(1)(A-1) refers to "bodily injury," the court inserted the substantive statutory definition of "bodily injury." The court then used the same approach in its instruction for aggravated assault as defined in section 208(1)(A). Coleman asserts that the court committed obvious error by substituting the plenary definition of "bodily injury" for the term itself because, he claims, the instructions conveyed to the jury that *any* measure of physical pain or physical illness alone would suffice to establish the nature of the injury that the State was required to prove on each count.

[¶25] While we acknowledge the court's effort to avoid presenting the jury with layers of definitions, Coleman is correct that the way the court combined aspects of statutory language resulted in instructions that were less clear than if the court had referred to "bodily injury" when explaining the nature of the injuries that constitute elements of the two counts of aggravated assault and then separately defined "bodily injury." Instructing the jury in two steps—first explaining the nature of the injury element as a function of "bodily injury" and then defining "bodily injury" itself—would eliminate any possibility that the critical language in the aggravated assault statute that modifies "bodily injury" would become untethered from the starting point of "bodily injury" itself.

[¶26]  Nonetheless, for several reasons, the way the court structured its instructions on each count of aggravated assault was not error, much less obvious error.  *See Dolloff*, 2012 ME 130, ¶ 36, 58 A.3d 1032.

[¶27]  First, when the court initially identified the elements of each count, the court described the requisite injury in terms of "serious bodily injury," *see supra* nn. 1-2, but did not further define "bodily injury."  This means, as Coleman acknowledges, that the initial instruction did not create any ambiguity.  This carries significance because, in assessing whether some instructions constituted obvious error, we must look at the instructions as a whole.  *See Weaver*, 2016 ME 12, ¶ 11, 130 A.3d 972.

[¶28]  Second, the follow-up instructions on the injury elements—the focus of Coleman's challenge—were not so unclear as to create a material risk that the jury would find Coleman guilty based on a less significant injury than the statutes require.  Neither the content nor the structure of the two challenged sentences in which the court explained the injury elements supports the notion that the jury was likely to be misled.  As previously mentioned, *see supra* n.6, any lack of clarity actually would have benefited Coleman rather than prejudice him.  More significantly, as for the structure of the challenged sentences, the phrase "physical pain" is not so separated from the important

modifying language to create confusion, particularly given that the initial instruction helped to protect against a misunderstanding of the court's elaboration on the injury elements.

[¶29]  Therefore, to the extent that there was any lack of clarity in the way the court instructed the jury on the injury element of each aggravated assault charge, Coleman has not demonstrated that it constituted error, or that any error was obvious or that any such error seriously affected the fairness or integrity of the court proceedings.  *See Dolloff,* 2012 ME 130, ¶ 35, 58 A.3d 1032; *Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147.  In short, Coleman is not entitled to a new trial based on the court's instructions.

C.    Sufficiency of the Evidence

[¶30]  Lastly, with respect to the aggravated assault charge based on section 208(1)(A-1), Coleman asserts that the evidence was insufficient to support the jury's determination that the child's injuries are permanent.  *See* 17-A M.R.S. § 208(1)(A-1).  When examining the sufficiency of the evidence that led to a guilty verdict, we consider that evidence in the light most favorable to the State to determine whether the fact-finder could rationally have found each element of the offense beyond a reasonable doubt.  *State v. Hall*, 2019 ME 126, ¶ 16, 214 A.3d 19.

18

[¶31]   Section 208(1)(A-1) provides that "[a] person is guilty of aggravated assault if that person intentionally, knowingly or recklessly causes . . . [b]odily injury to another that causes serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ." Coleman construes this statute such that "permanent" modifies not only "disfigurement" but also "loss" and "substantial impairment."  This is significant because, here, there is no evidence that the child's injuries were disfiguring.  Rather, the jury was presented with evidence of a loss or substantial impairment of function.  Thus, Coleman's reading of the statute would require the State to prove that the loss or substantial impairment will be permanent.  The State has not challenged Coleman's construction of section 208(1)(A-1).  For present purposes, we therefore assume—without deciding—that Coleman's reading of the statute is correct.[8]

[¶32]  Contrary to Coleman's contention, even when section 208(1)(A-1) is construed as he urges, the evidence was sufficient to allow the jury to

---

[8]   It may be that 17-A M.R.S. § 208(1)(A-1) can be interpreted in different ways, creating an ambiguity.  *See State v. Legassie*, 2017 ME 202, ¶ 13, 171 A.3d 589 ("A statute is ambiguous if it is reasonably susceptible to different interpretations." (quotation marks omitted)).  The absence of helpfully placed commas, combined with multiple conjunctions in the phrase "serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ," may make it unclear whether "permanent" modifies only "disfigurement" or also "loss" or "substantial impairment."  As noted in the text, however, this case does not provide an occasion for us to address the interpretive issue further.

reasonably find that the child's injuries are permanent. *See Hall*, 2019 ME 126, ¶ 16, 214 A.3d 19. The child's mother testified, for example, that the child had undergone multiple surgical procedures and that, at the time of the trial, which was nearly one-and-a-half years after the assault, the child was developmentally delayed as manifested by her inability to walk or sit up by herself and by the absence of any meaningful verbal language skills.

[¶33] Also included in the record was medical evidence of the child's severe neurological injuries, which resulted in seizures, and, when the child was treated early on, of the "very guarded neurological prognosis" offered by her treating pediatric neurologist, who harbored concerns that the injuries could lead to cerebral palsy, intellectual disabilities, epilepsy, lack of vision, and lack of verbal communication. In fact, months later, testing revealed that the child was in the "extremely low range" for cognitive, language, and motor development, and she exhibited abnormal movement patterns. In order for the child to make developmental gains, the child will need extensive support and interventions. Although the durational extent of the child's injuries was not quantified, the jury was entitled to find, based on evidence of the child's serious injuries and her significant ongoing challenges, that she will suffer tragic, life-limiting, and life-long effects from the injuries inflicted by her father.

### III.  CONCLUSION

[¶34]  In summary, there was no prosecutorial misconduct, the court's jury instructions did not constitute obvious error, and there was sufficient evidence in the record to support the jury's verdict.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law, LLC, Berwick, for appellant Brandon J. Coleman

Jennifer Ackerman, Dep. Dist. Atty. (orally), Cumberland County District Attorney's Office, Portland, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2017-5213
FOR CLERK REFERENCE ONLY